**Alfred NELSON, Sr., et al.**

v.

**Terrence FLANAGAN et al.**

Supreme Judicial Court of Maine.

Argued April 2, 1996.
Decided June 7, 1996.

Jeffrey A. Smith (orally), Smith & Associates, P.A., Hallowell, for Plaintiffs.

George Z. Singal (orally), Sandra L. Rothera, Gross, Minsky, Mogul & Singal, P.A., Bangor, Penny St. Louis (orally), Preti, Flaherty, Beliveau & Pachios, Portland, for Defendants.

Before WATHEN, C.J., and ROBERTS, GLASSMAN, CLIFFORD, DANA, and LIPEZ, JJ.

DANA, Justice.

This case is before us on report, pursuant to M.R.Civ.P. 72(c), of an interlocutory order entered in the Superior Court (Kennebec County, *Atwood, J.*) granting the defendants' motion for a summary judgment against Alfred Nelson, Sr., and his son, Alfred, Jr. on their claims for negligent infliction of emotional distress (NIED). The Nelsons argue that the court (*Crowley, J.*) incorrectly applied Maine law with regard to such claims or in the alternative that Maine should recognize a distinction between NIED claims that result from medical misdiagnosis and other NIED claims. We affirm the judgment.

Joyce Nelson, the wife and mother of the two plaintiffs, died sometime around midnight on June 12, 1987. The events leading to her death may be summarized as follows. In September 1986 Joyce injured her back. In February 1987 Joyce began complaining that the pain in her back was traveling to her stomach area. Joyce complained about the pain in her stomach approximately once a week. Throughout this time Joyce was examined by at least two doctors, neither of whom was able to diagnose her condition. On June 11, 1987, Joyce was bedridden with pain for the first time. Alfred, Sr., cared for her throughout the day and evening. At approximately 12:45 a.m. on June 12 Alfred, Sr., called Alfred, Jr., an emergency medical technician with the Augusta Fire Department, seeking advice. Alfred, Jr., told his father to call an ambulance and have Joyce taken to the emergency room at Kennebec Valley Medical Center.

At the hospital Joyce was treated by Dr. Flanagan. Alfred, Sr., sat approximately eight to ten feet away from Joyce while she was examined by Flanagan, and overheard his wife tell Flanagan that her pain went from her back to her stomach area. Alfred, Sr., did not speak directly to Flanagan, the nurses, or the ambulance crew that drove Joyce to the hospital. Alfred, Sr., stated that he did not hear anything Flanagan said to his wife during the examination because they were speaking in hushed tones. Flanagan gave Joyce a shot of Demarol and told her that it was important for her to call her regular doctor, Dr. Davis, in the morning. Joyce was then discharged from the emergency room and taken home by ambulance. Later that morning Alfred, Jr., while at the emergency room as part of his job, approached Flanagan about his mother's visit. Alfred, Jr., stated that Flanagan told him that his mother had been in a lot of pain and that he had given her some Demarol to get her through the night.

Alfred, Sr., sat at Joyce's bedside from the time they returned from the hospital until approximately 10:30 p.m. They talked, but Alfred, Sr., does not remember the contents of their conversation. Alfred, Jr., did not visit his mother that day because he was working. Alfred, Sr., tried to call Dr. Davis in the morning but was told that Davis would not be in that day. Alfred, Jr., spoke with Davis on the afternoon of June 12 and informed him that his mother had been to the emergency room. Davis told him that his treatment at that time consisted of ongoing tests. At approximately 10:30 p.m. Joyce told her husband that she felt relaxed enough to go to sleep. Alfred, Sr., went into another room and fell asleep until approximately midnight. When he then checked on his wife she was dead.

Father and son filed a notice of a claim and a complaint in their personal capacities and also as co-personal representatives of the estate of Joyce Nelson. The defendants moved for a partial summary judgment as to their NIED claims. The court, relying on *Cameron v. Pepin,* 610 A.2d 279 (Me.1992), ruled that Alfred, Jr.'s, claim was barred because he was not present at the hospital with his mother. The court concluded that Alfred, Sr., was unable to generate a genuine issue that he perceived any trauma inflicted on his wife while she was at the hospital.[1] The Nelsons sought a

---

1. In their motions for a summary judgment the defendants also argued that the plaintiffs' individual NIED claims were barred by the wrongful death act, 18–A M.R.S.A. § 2–804 (1981 & Supp. 1995). The result we reach renders that argument moot and we therefore do not address it.

M.R.Civ.P. 54(b) certification that the court's grant of a partial summary judgment was final and simultaneously filed a notice of appeal. The Superior Court denied the 54(b) certification and we remanded the case back to the Superior Court for a final disposition of all pending claims. A different justice of that court subsequently reported the case to this Court pursuant to M.R.Civ.P. 72(c).[2]

In *Culbert v. Sampson's Supermarkets, Inc.*, 444 A.2d 433, 436 (Me.1982), we adopted the "foreseeability" test of *Dillon v. Legg*, 68 Cal.2d 728, 69 Cal.Rptr. 72, 441 P.2d 912 (1968), for governing the scope of liability for NIED claims.

> [A] bystander may recover damages for serious mental distress foreseeably resulting from witnessing another person harmed by the tortfeasor's negligent act. The psychic injury may be deemed foreseeable when the plaintiff bystander was present at the scene of the accident, suffered mental distress as a result of observing the accident and ensuing danger to the victim, and was closely related to the victim.

*Culbert*, 444 A.2d at 438. In *Culbert* the plaintiff alleged that she bought a jar of baby food at the defendant supermarket and a foreign substance in the food caused her six month old son to choke, in turn causing her severe emotional distress. *Id.* at 434. The trial court's grant of a dismissal and a summary judgment in favor of the defendants was based on the fact that the plaintiff was not in the "zone of danger" of harm. *Id.* at 438. We remanded the case to the trial court for its consideration of the plaintiff's allegations in light of our adoption of the above quoted language. *Id.*

In *Gammon v. Osteopathic Hosp. of Me., Inc.*, 534 A.2d 1282 (Me.1987), we vacated a directed verdict in favor of the defendant on the plaintiff's NIED claim. We reaffirmed our reliance on the foreseeability analysis previously adopted in *Culbert*, and held that the defendants, in the context of delivering a body part to the plaintiff along with the plaintiff's just deceased father's personal effects, should have foreseen that mental distress would result from their negligence. *Id.* at 1285.

In *Cameron v. Pepin*, 610 A.2d 279 (Me. 1992), the defendant was involved in an automobile accident with the plaintiffs' son. *Id.* at 280. The plaintiffs learned of the accident shortly after its occurrence and went straight to the hospital emergency room, where they saw their son "cut, bloody, and battered." *Id.* The plaintiffs remained with their son in the hospital until he died six days later. *Id.* The defendant was found liable for the plaintiffs emotional distress in a jury-waived trial. *Id..* We were required to consider, "for the first time since *Culbert*, the distinction between direct and indirect victims and [to] determine the scope of the legal duty a defendant owes to an indirect victim." *Id.* at 281. The plaintiffs in *Cameron* argued that pursuant to *Gammon*, whether a defendant owes a duty to a plaintiff is solely a question of fact, to be determined by a factfinder in light of the foreseeability of the plaintiff's harm. *Id.* In rejecting this argument we noted that foreseeability is but one factor to be weighed by *courts* in their determination of a defendant's duty. *Id.* at 282. Also included in this determination are policy implications. *Id.* We noted that, although in *Gammon* the foreseeability component dominated the analysis and thus should properly have been decided by the factfinder, in cases of indirect victims the need for liability limits was more compelling.[3] *Id.* at 282–83. We thus rejected a "pure foreseeability" standard, recognizing instead the need for courts to consider competing policy arguments in

---

2. We note that we have previously recognized that, in the interest of intracourt comity, M.R.Civ.P. 72(c) "is not to be interpreted as authorizing a member of the Superior Court to sponsor what is in effect an interlocutory appeal from a decision of another member of the same Court." *Belanger v. Belanger*, 240 A.2d 743, 744 (Me.1968). Because, however, the issue on report has been fully briefed and argued we will address its merits.

3. In *Gammon* the plaintiff was the direct victim of the defendant's negligence because he discovered what he thought was his father's amputated leg. In *Cameron* and the instant case the plaintiffs are all indirect victims because the claimed negligence underlying the NIED claim was not directed at them, but instead at someone they loved and were close to.

their determinations of the extent of a defendant's duty. *Id.* at 284. Vacating the judgment in favor of the plaintiffs, we reaffirmed that a plaintiff must demonstrate that she:

> i) was present at the scene of the accident, ii) suffered serious mental distress as a result of contemporaneously perceiving the accident, and iii) was closely related to the victim.

*Id.* at 284–85. It is against this backdrop that this case is presented on report.

The Nelsons make two arguments in support of the imposition of liability on the defendants in this case. First, they argue that they meet and exceed the *Cameron* test. Alternatively, they argue that *Cameron* is not applicable to an NIED claim that results from a medical misdiagnosis.

## I.

■ In support of their first argument the Nelsons contend that the "accident" occurred in the hospital emergency room, both while Joyce was there and when Alfred, Jr. visited later that morning and spoke with Flanagan, and also at the Nelson home both after the emergency room visit and after Joyce's death. If a cause of action did accrue (i.e., the "accident") it did so when Joyce was allegedly misdiagnosed at the hospital. To extend the defendants' liability any further would directly contradict *Cameron*'s warning that

> to avoid limitless liability out of all proportion to the degree of a defendant's negligence, and against which it is impossible to insure without imposing unacceptable costs on those among whom the risk is spread, the right to recover for negligently caused emotional distress must be limited.

*Cameron,* 610 A.2d at 284 (*quoting Thing v. La Chusa,* 48 Cal.3d 644, 257 Cal.Rptr. 865, 877–79, 771 P.2d 814, 826–27 (1989)). Because Alfred, Jr., was not at the hospital when his mother was being treated, and in fact did not even witness his mother suffering as a result of Flanagan or the hospital's alleged negligence, he cannot recover on a claim of NIED.

■ Alfred, Sr., was at the hospital when Joyce was treated, and as her husband he obviously is closely related. He therefore meets the first and third requirements of the *Cameron* parameters for NIED claims. To survive the defendants' motion for a summary judgment Alfred, Sr., thus has to have raised a genuine issue of material fact that he "suffered serious mental distress as a result of contemporaneously perceiving the accident." *Cameron,* 610 A.2d at 284–85. Alfred, Sr., stated in his deposition that he did not speak with any of the nurses at the emergency room and he did not hear anything his wife said to them. Alfred, Sr., did not speak with Flanagan and he did not hear anything Flanagan said to his wife. The only thing Alfred, Sr., heard his wife say to Flanagan was that she felt pain in her back and stomach. Alfred, Sr., did not have any conversation with his wife about the hospital "treatment" before she died, and she did not tell him what Flanagan said to her. Neither Alfred, Sr., nor his wife told anyone at the hospital that they thought Joyce should not be discharged. At his second deposition in 1990 Alfred, Sr., stated that his distress today is related to the loss of his wife, not anything having to do with what happened in the emergency room. In response to a question whether he was going through any emotional distress while at the emergency room Alfred, Sr., stated "I don't know. I wasn't until he decided to send her home." Conversely, Alfred, Sr., did say that when he thinks back about what happened he thinks Joyce should have been admitted, and that the defendants' failure to admit her causes him emotional stress. Because Alfred, Sr.'s, after-the-fact emotional distress is not the result of an immediate perception of Flanagan's alleged misdiagnosis he does not come within the class of plaintiffs who, pursuant to *Cameron,* are foreseeable indirect victims of a defendant's negligence. *See, e.g., Frame v. Kothari,* 115 N.J. 638, 560 A.2d 675, 679 (1989) (interpreting lower court decision in earlier, unrelated case as denying recovery on plaintiff's NIED claim where mother watched deterioration of child over three days without appreciation of impact of doctor's act of malpractice).

## II.

■ In support of their second argument the Nelsons point to several other jurisdic-

tions that have dealt with NIED claims where a medical misdiagnosis is the underlying negligence complained of, and argue that those courts correctly recognize a difference between a medical negligence NIED claim and an accident NIED claim. The Nelsons argue that a distinction is necessitated by the inherent differences between acts of medical negligence, that are ongoing in nature, versus, for instance, an automobile accident, that is sudden and immediately obvious.

In *Ochoa v. Superior Court*, 39 Cal.3d 159, 216 Cal.Rptr. 661, 703 P.2d 1 (1985), the parents of a boy being held in the defendant's juvenile facility sought damages for the emotional distress that resulted from witnessing their son in agony in the facility's infirmary, begging for the staff's assistance, and receiving only assurances that everything was fine. *Id.* 216 Cal.Rptr. at 666 n. 7, 703 P.2d at 6 n. 7. The boy clutched his mother and begged her not to leave him, the mother begged that she at least be allowed to have the family doctor see her son, and she stayed at the infirmary until she was forcibly removed. *Id.* 216 Cal.Rptr. at 663–64, 703 P.2d at 3–4. In vacating the trial court's dismissal of the plaintiffs' action the California Supreme Court stressed that liability was predicated not on the subsequent death of the plaintiffs' son, but instead on the shock and trauma experienced upon seeing their son's medical needs being ignored: "when there is observation of the defendant's conduct and the ... injury *and* contemporaneous awareness the defendant's conduct or lack thereof is causing harm ... recovery is permitted." *Id.* 216 Cal.Rptr. at 668, 703 P.2d at 8 (emphasis added). In other words, as in *Cameron*, the requirement that a contemporaneous awareness that the defendant's conduct is causing the harm is maintained.

In *Frame v. Kothari* the parents of an infant brought their son to a health clinic after he fell down the stairs of their home. *Frame v. Kothari*, 560 A.2d at 676. At the clinic he was seen by the defendant, who told the parents to take their son home and awaken him every four hours to check for symptoms of a head injury. *Id.* When the parents awoke their son four hours after he went to sleep they called the defendant and told her that their son's eyes were "pivoting," or rolling in their sockets. *Id.* The doctor told them to let him sleep four more hours, and when they awoke him after that four hours he was moribund. *Id.* 560 A.2d at 677. The son died approximately twelve hours later. *Id.* The basis of the parents' claim was the defendant's failure to tell the parents to bring their son to the clinic when they reported that his eyes were "pivoting." *Id.*

The *Frame* court canvassed other state decisions, and concluded that most courts agree that

> one family member should not recover for emotional distress resulting from the misdiagnosis of another family member, at least in the absence of a close temporal connection between the misdiagnosis and the injury, as well as the contemporaneous observation of the injury by the family member.

*Id.* 560 A.2d at 679. The court, citing *Ochoa*, recognized that occasionally a case of medical misdiagnosis will result in a cause of action for NIED, but denied the plaintiff parents' recovery because no injury was manifested to them until four hours after the alleged misdiagnosis occurred. *Id.* 560 A.2d at 681.

We do not disagree with the recognition apparent in both *Ochoa* and *Frame* that in an appropriate case a medical misdiagnosis may result in an allowable claim for NIED. We find, however, that *Cameron*'s discussion of foreseeability and its relation, along with appropriate policy considerations, to a defendant's duty to an indirect victim of the defendant's negligence sufficiently covers medical misdiagnosis.

The entry is:

The partial summary judgment entered in the Superior Court on August 7, 1995, is affirmed.

All concurring.