1998 ME 213

### Brian MICHAUD

v.

### GREAT NORTHERN NEKOOSA CORPORATION and Colwell Construction Company, Inc.

Supreme Judicial Court of Maine.

Argued Feb. 4, 1998.

Decided Aug. 19, 1998.

---

Peter B. Bickerman (orally); Robert J. Stolt, Lipman & Katz, Augusta, for plaintiff.

Terry A. Fralich (orally), Peter J. DeTroy Norman, Hanson & DeTroy, Portland, for defendant Great Northern Nekoosa.

Elizabeth A. Olivier (orally), Bruce C. Gerrity, Preti, Flaherty, Beliveau & Pachios, L.L.C., Portland, for defendant Colwell Construction.

Paul F. Macri, Lewiston, for amicus curiae Richard Bourgeois.

Before WATHEN, C.J., and ROBERTS, CLIFFORD, RUDMAN, DANA, LIPEZ *, and SAUFLEY, JJ.

WATHEN, Chief Justice.

[¶ 1] Plaintiff Brian Michaud appeals from a summary judgment entered in the Superior Court (Penobscot County, *Mead, J.*) in favor of defendants, Great Northern Nekoosa Corporation (Great Northern) and Colwell Construction Company (Colwell). Plaintiff brought an action for negligent infliction of emotional distress, and the court ruled that defendants had no legal duty to protect him. On the theory that a "rescuer is not a

---

* Lipez, J., sat at oral argument and participated in the initial conference but resigned before this opinion was adopted.

bystander," he urges us to recognize, for the first time, a duty of care to protect a rescuer from emotional distress even in the absence of a familial relationship with the persons in peril. We decline to expand recovery on claims for negligent infliction of emotional distress. The Superior Court correctly ruled that Michaud failed to satisfy the established criteria, and we affirm the judgment.

[¶ 2] The facts, considered in the light most favorable to Michaud, may be summarized as follows: Great Northern owns and operates the Ripogenus Dam located on the Penobscot River near Millinocket. In 1989, Great Northern hired Colwell as general contractor for a major repair project on the dam. Colwell was responsible for overseeing the entire project and supporting and assisting a diving team. Great Northern hired a diving contractor, Aqua–Tech Marine Construction Co. (Aqua–Tech), to perform all of the diving work associated with the project.

[¶ 3] The incident that gave rise to this litigation took place during the repair of a "deepgate." Tunnels or sluiceways extend through Ripogenus Dam. A "deepgate" blocks the water in a tunnel. Because the impounded water exerts pressure on the deepgate, periodic repairs become necessary. To remove a deepgate for repairs, a maintenance gate is installed upstream in the tunnel, creating a cavity between the gates that permits the removal of the deepgate. Once the repairs are completed, the deepgate is replaced and the cavity between the two gates is filled with water. The maintenance gate cannot be removed until the cavity is filled and the water level and pressure on both sides of the maintenance gate are equalized.

[¶ 4] In this instance, Colwell installed a temporary maintenance gate and successfully removed, repaired, and reinstalled the deepgate. When it attempted to fill the cavity between the gates, the valve in the maintenance gate failed to allow sufficient water to pass into the cavity to equalize the pressure.

[¶ 5] Because the maintenance gate could not be removed until the cavity was filled, Colwell's superintendent and two of Great Northern's engineers devised a plan to increase the water flow through the mainte-

nance gate: Divers would first attempt to "wedge" the maintenance gate to create an opening at the top of the gate to allow more water to flow into the tunnel; if unsuccessful, the divers would then cut holes in the maintenance gate to further increase the flow of water; and finally, if all else failed, they would obtain pumps to pump water over the maintenance gate into the cavity. The plan was put in place when two Aqua–Tech divers, Albert Harjula and Daniel Sullivan, arrived at the work site.

[¶ 6] The two divers had no advance notice of the plan and were prepared only to attach hooks to the maintenance gate. Because they had not brought tools for underwater cutting, Colwell loaned them its tools. Sullivan dove first and, although he successfully wedged the gate, the water flow did not increase sufficiently to fill the cavity. Thereafter, according to a Colwell employee, one of Great Northern engineers exerted "peer pressure" on the divers to cut a 4" × 8" hole in the maintenance gate. Harjula, the more senior of the two divers, refused to allow Sullivan to cut a hole but agreed that Sullivan could cut "slots" in the gate. This too failed to sufficiently increase the water flow. Over lunch, the engineers again asked the divers to cut holes in the gate. This time, Harjula agreed.

[¶ 7] As Sullivan was out of dive time for the day, Harjula made a number of dives to extend the ends of the slots to create rectangular holes. At 3:42 p.m., Harjula made a final attempt to cut additional holes. During this dive, he lost a glove and then a hammer; both were presumably sucked through a hole in the gate. He resurfaced to get a new glove, and a new hammer was sent down to him. A few minutes later, he radioed that he had lost a cuff from his wet suit and asked to be pulled up. When the surface crew began to pull, he yelled through the radio that his feet were stuck in a hole in the gate. The crew continued to pull but could not free him. At this point, Colwell's superintendent called Aqua–Tech's headquarters to locate additional divers to assist with a rescue attempt. Aqua–Tech in turn called Great Northern who also began searching for additional divers.

[¶ 8] Sullivan, the second diver, was on the surface with the other employees. Becoming increasingly agitated, he stated that he had to try and rescue his partner and could not just let him die. Sullivan, however, was not equipped to make a rescue attempt. He had no radio equipment, he was out of dive time for the day, and he had no plan or method for rescuing Harjula. Although it is disputed whether Sullivan was ordered not to dive, he dove at 5:35 p.m. After resurfacing twice, he too became trapped in the holes in the gate. Although he continued to communicate through rope pulls, after thirty minutes all communication ended.

[¶ 9] Plaintiff Michaud, an Aqua–Tech diver working on another construction project, had planned to meet Sullivan that evening. While waiting, he received a telephone call from his mother informing him that Harjula was "stuck" underwater and that Sullivan was going to dive to try and rescue him. She told him that a worker at the dam project had come to her store in Greenville and asked her to contact Michaud to help with the rescue.

[¶ 10] Michaud arrived at the work site at 6:15 p.m. At about the same time, another Aqua–Tech diver, Richard Bourgeois, arrived at the site and took charge of the rescue attempt. Bourgeois sent a diver into the water to evaluate the situation. That diver panicked and Bourgeois ordered him to surface. It is unclear whether Bourgeois then asked Michaud to dive or whether Michaud volunteered.

[¶ 11] At 7:30 p.m., Michaud dove to a depth of approximately fifty feet and observed both divers with their legs trapped in holes in the gate. Although he shined a light on both divers, neither responded. He could not visually confirm if the divers were still alive. Michaud thought that Sullivan grabbed him at one point, although he noted that it could have been as a result of his own contact with Sullivan's body.

[¶ 12] By radio, Bourgeois instructed Michaud to attach a chainfall to each diver's harness so that they could pull the divers out of the holes. Michaud told Bourgeois that Sullivan was caught up to his knee and the chainfall would "bust him up." Bourgeois repeated his order and Michaud attached the chain through both divers' harnesses. Harjula's harness broke as soon as they tried to pull him to the surface. Sullivan's harness remained attached and the crew pulled while Michaud placed his hands around Sullivan's leg in an effort to help extricate it from the hole. Michaud was mindful of the fact that he needed to keep sufficient distance between himself and the gate to avoid being sucked into the holes.

[¶ 13] When the chain was pulled for the final time, Michaud heard a pop and observed Sullivan's lower leg tear from his body. Sullivan's body quickly surfaced and Michaud, still underwater, was surrounded by Sullivan's blood. Bourgeois heard Michaud screaming over the radio, and when Michaud surfaced a minute later, he was totally incoherent and in severe shock. Michaud and Sullivan were transferred to a hospital in the same ambulance and Sullivan was pronounced dead, in Michaud's presence, when they arrived at the hospital. Harjula also died. His body was not recovered until the next morning. Michaud was hospitalized overnight. Following his release, he was diagnosed with post-traumatic stress disorder.

[¶ 14] Michaud filed the present complaint for negligent infliction of emotional distress. He alleged that Great Northern and Colwell each owed him a duty of care to protect him from psychic injury. Both defendants filed motions for summary judgment. In granting the motions, the court concluded as a matter of law that defendants owed Michaud no duty to protect him from psychic injury because (1) he was not within the protected class of indirect victims, (2) that no independent duty of care is owed a rescuer, and (3) even if a derivative duty of care flows from any duty owed to the original divers, Michaud could not recover for purely psychic injuries. Michaud now appeals from this judgment.

▮ [¶ 15] The determination of the extent of the duty owed in claims for negligent infliction of emotional distress involves striking a fair balance between the need to compensate foreseeable psychic injuries and the

risk of imposing limitless liability. *See Cameron v. Pepin,* 610 A.2d 279, 283 (Me.1992). Whether a plaintiff is owed a duty of care is a matter of law, *see Denman v. Peoples Heritage Bank, Inc.,* 1998 ME 12, ¶ 4, 704 A.2d 411, 413; but as we noted in *Cameron,* the existence and scope of a defendant's duty in claims of negligent infliction of emotional distress, "is not entirely a question of foreseeable risk of harm but is in turn dependent on recognizing and weighing relevant policy implications." *Cameron v. Pepin,* 610 A.2d at 282; *Trusiani v. Cumberland and York Distributors, Inc.,* 538 A.2d 258, 261 (Me. 1988).

▬ [¶ 16] In the past, we have recognized that the "victim of negligent conduct has a legally protected interest in his psychic health, with different rules governing recovery dependent on whether the plaintiff is characterized as a 'direct' victim rather than an 'indirect' victim." *Cameron v. Pepin,* 610 A.2d at 280–81. We recently described the distinction between direct and indirect victims in the following terms:

> A plaintiff is a direct victim if she was the object of the defendant's negligent conduct. *See, e.g., Gammon v. Osteopathic Hosp. Of Me., Inc.,* 534 A.2d 1282 (Me. 1987) (plaintiff who discovered severed human leg in bag that he thought contained his recently deceased father's belongings was direct victim of hospital's and funeral home's alleged negligent conduct). In contrast, a plaintiff is an indirect victim if the claimed negligence underlying the NIED claim was directed not at her, but instead at someone she loved and to whom she was close. *See Nelson v. Flanagan,* 677 A.2d 545, 547 n. 3 (Me.1996); *see, e.g., Culbert v. Sampson's Supermarkets, Inc.,* 444 A.2d 433, 438 (Me.1982) (mother who observed her child choking on a foreign object in baby food manufactured by defendant was indirect victim of defendant's negligent conduct).

*Champagne v. Mid–Maine Medical Center,* 1998 ME 87, ¶ 6, 711 A.2d 842, 844. The "direct victim" claiming negligent infliction of emotional distress may recover when the defendant's negligence was directed at the victim; namely, that the defendant owed the victim an independent duty of care and that the defendant should have foreseen that mental distress would result from his negligence. *See Gammon v. Osteopathic Hospital of Maine, Inc.,* 534 A.2d 1282, 1285 (Me. 1987). In contrast, the "indirect victim" who witnesses another person being harmed by a tortfeasor's negligent act may recover for serious mental distress only if "[t]he psychic injury may be deemed foreseeable when the plaintiff bystander was present at the scene of the accident, suffered mental distress as a result of observing the accident and ensuing danger to the victim, and was closely related to the victim." *Culbert v. Sampson's Supermarkets, Inc.,* 444 A.2d 433, 438 (Me.1982).

▬ [¶ 17] Michaud seeks recovery solely on the theory of negligent infliction of emotional distress—he claims no physical injury. Accordingly, he must qualify as either a direct or indirect victim of the alleged negligence. He is unable to satisfy either criteria. First, the absence of a family relationship with the trapped divers precludes his claim as an indirect victim, a conclusion that he does not dispute. *See Cameron v. Pepin,* 610 A.2d at 284–85. Second, defendants' alleged negligence was directed at the two divers trapped in the maintenance gate. Michaud was not the object of this alleged negligent conduct. *See Champagne v. Mid–Maine Medical Center,* 1998 ME 87, ¶ 6, 711 A.2d at 844; *Nelson v. Flanagan,* 677 A.2d 545, 547 n. 3 (Me.1996).

[¶ 18] To avoid the obvious implication of existing law, Michaud asks that we recognize the "rescue doctrine," arguing that defendants would then owe him a direct duty of care to avoid the infliction of emotional distress even if the underlying act of negligence was not directed at him. The duty of care would be derived from the duty owed to the imperiled victim. In essence, Michaud argues that his status as a rescuer should lead us to recognize a broader duty of care than that owed to a bystander.

▬ [¶ 19] Although generally there is no duty to lend personal assistance, in an effort to encourage rescue efforts and avoid the assertion of a contributory negligence defense against a plaintiff-rescuer, some juris-

dictions have adopted a "rescue doctrine" with respect to claims for physical injuries. In principle, those courts hold that when a defendant creates the peril facing a victim, the defendant will be liable to a rescuer for the physical injuries incurred during the rescue attempt. Note, *Tort Law—The Application Of The Rescue Doctrine Under Comparative Negligence Principles*, 23 N.M.L.Rev. 349, 350 (1993). The rationale for the "rescue doctrine" was articulated by Justice Cardozo in the following terms: "The wrong that imperils life is a wrong to the imperiled victim; it is a wrong also to his rescuer." *Wagner v. International Ry. Co.*, 232 N.Y. 176, 133 N.E. 437, 437 (1921). By negligently creating the peril, a defendant is deemed to have issued an implied invitation to render assistance and responsibility for harm that results from such invitation is assigned to the defendant.

[¶ 20] In *Hatch v. Globe Laundry Co.*, 132 Me. 379, 171 A. 387 (1934), we rejected the theory that, as a matter of law, rescuers are precluded from recovery on the basis that they voluntarily placed themselves in danger. We have never adopted the rescue doctrine, and in *Hatch* we simply recognized that issues of causation are implicated when a party seeks to rescue a victim imperiled by the defendant's negligent conduct. The rescue doctrine has never been applied in any jurisdiction in a case involving purely psychic injuries. Were we to adopt it, this would not end any analysis in the present case. Even if the rescue doctrine gives rise to an independent duty of care owed to the rescuer and emotional distress is a foreseeable result of the defendants' negligence, "policy considerations may dictate a cause of action should not be sanctioned no matter how foreseeable the risk." *Cameron v. Pepin*, 610 A.2d 279, 282 (Me.1992). In claims for the negligent infliction of emotional distress, we must avoid inappropriately shifting the risk of loss and assigning liability disproportionate to culpability. We do not minimize the heroic and selfless acts of a rescuer, but such a person is not a "direct victim" pursuant to Maine law. To create a special exception for a rescuer in the context of a claim for emotional distress would expand liability out of proportion with culpability. *See Cameron v. Pepin*, 610 A.2d 279, 282 (Me.1992).

The entry is:

Judgment affirmed.