STATE OF MAINE                          SUPERIOR COURT
WALDO, SS.                              Docket No. CV-98-24
                                        J. H - VAL - 6/19/2001

Robert H. Carter et al.,        )
            Plaintiffs          )
                                )
                                )
                                )
            v.                  )        **DECISION AND JUDGMENT**
                                )
                                )
Kevin D. Williams et al.,       )
            Defendants          )

STATE OF MAINE
Superior Court

JUN 19 2001

REC'D AND FILED
Joyce M. Page, Clerk

A jury-waived trial was held in this matter on November 2, 2000. At trial, both plaintiffs were present with counsel, and the defendants were represented by their attorney. Subsequent to the presentation of evidence on and after November 2, the parties submitted written argument on the contested issues.

This action arises out of a tragic motor vehicle accident that occurred on June 3, 1996. The members of the Carter family were travelling on the Coles Corner Road in Winterport, destined for Bangor. Barbara Carter was driving the vehicle, and her husband, Robert, was in the front passenger seat. Their daughters Karen and Jessica were in the back seat on the driver's and passenger's sides, respectively. The Carter vehicle passed by an oncoming dump truck owned by defendant Vaughan Thibodeau and Sons, Inc. ("Thibodeau") and operated by one of Thibodeau's employees, defendant Kevin Williams. The truck caused a rock to become airborne; the rock entered the passenger compartment of the Carter vehicle through the windshield and struck both Barbara and Karen. Karen's injuries were fatal.

1

Robert and Barbara Carter, in their individual and representative capacities, brought suit against Thibodeau and Williams.[1] In their complaint, they have asserted a number of claims.[2] Except as is noted in this order, the defendants do not contest the liability grounds that the plaintiffs allege as a basis for compensatory damages. Further, the parties have framed the contested issues with considerable precision in their stipulation filed on November 28, 2000.

## A. Count 1 (wrongful death of Karen Carter)

The Wrongful Death Act, codified in 18-A M.R.S.A. § 2-804, entitles the personal representative of decedent's estate to seek compensatory recovery for certain losses occasioned by a wrongful death. Barbara is that personal representative. Compensatory damages are to based on (1) the reasonable cost of medical treatment and funeral expenses, (2) pecuniary loss caused by that wrongful death, and (3) the loss of comfort, society and companionship of the deceased.

Here, the parties have stipulated that the reasonable cost of medical treatment and funeral expenses is $8,812.10.

Next, the plaintiffs seek recovery for pecuniary loss which they allege will be denied to them because of Karen's death. There is insufficient evidence for the court to conclude that Karen's death has deprived the beneficiaries of pecuniary or economic benefit. Although the

---

[1] In this opinion, the court will identify members of the Carter family by their first names, not as a form of disrespect, but for ease of reference.

[2] The plaintiffs have withdrawn their claims for Karen's conscious pain and suffering (count 2) and their claim for punitive damages (count 7). Their remaining claims for compensatory damages remain at issue.

2

evidence demonstrates that Karen had a strong relationship with her parents, she was nine years old when she died. Any assertion that Karen would have provided her parents with financial support some time in the future necessarily would rest on speculation.

Finally, the parties have agreed that Barbara, as personal representative, is entitled to recover the maximum statutory compensation for the loss of loss of Karen's comfort, society and companionship. At the time of the accident, the statutory limit was $75,000. Effective July 4, 1996 (roughly one month after the accident), section 2-804(b) was amended to allow recovery of no more than $150,000 for such a loss. *See* P.L. 1995, c. 577, § 1. This action was commenced on June 1, 1998 (the date the complaint was filed). *See* M.R.Civ.P. 3(2). Therefore, the resulting question is whether the increase in compensatory damages is available to Barbara, where the amended statute was not in effect at the time of the loss but was in effect when this action was commenced. The parties contest whether the limitation enacted in the 1996 legislation governs Barbara's claim under section 2-804.[3]

A statutory enactment or amendment that affects the procedural course of a claim applies to proceedings that are pending on or after the effective date of that statute. *Heber v. Lucerne-in-Maine Village Corp.*, 2000 ME 137, ¶ 11, 755 A.2d 1064, 1067. Such an application is not considered to be retroactive, because the statute is germane only to the

---

[3] In their brief, the plaintiffs also argue that their claim under section 2-804 is governed by current statutory formulation, which allows a recovery of $400,000. This position, however, defies not only the parties' stipulation but also the express statutory provision that the amendment increasing such recovery to $400,000 applies only to causes of action arising on or after the effective date of that amendment, which was August 11, 2000. *See* P.L. 1999, c. 772, § 2.

proceeding and not to the substance of the underlying claim. *Id. See also Norton v. C.P. Blouin, Inc.*, 511 A.2d 1056, 1060 n.5 (Me. 1986). If, however, the post-loss statutory change affects the substantive rights held by a party to the claim, then application of that statutory provision to the claim would be retroactive in nature. *Heber*, 2000 ME 137, ¶ 11, 755 A.2d at 1067. A substantive statutory provision can be applied retroactively only if the legislature clearly and expressly intended such an application, *Norton*, 511 A.2d at 1060 n.5, or if that result obtains by necessary implication, *Michaud v. Northern Maine Medical Center*, 436 A.2d 398, 400 (Me. 1981). "[R]etroactive application" of statutes (which, under the teachings of the Law Court opinions, means substantive statutory provisions) are not favored. *Id.* Here, if the 1996 amendment to section 2-804 is substantive, then it does not apply to this proceeding because the legislature did not clearly express its intent that the amendment apply to existing claims. On the other hand, if that statutory change is procedural, then it controls this case because the proceeding at bar was initiated after the effective date of that amendment.

In determining whether the 1996 amendment is substantive or procedural for purposes of this analysis, the court finds guidance in *Terry v. St. Regis Paper Co.*, 459 A.2d 1106 (Me. 1983). There, the Law Court held that an amendment to the statutory formula used to determine the level of worker's compensation benefits, when that amendment was effective after she had sustained her injury, was substantive in nature. *Id.* at 1108. The retroactive application of a substantive provision is one that is used to "determine the legal significance of acts or events that occurred prior to its effective date." *Id.* (internal punctuation omitted). If a

4

statutory amendment would "alter[] the consequences" of the incident that generated the loss, then the change is substantive. *Id.*

In *Batchelder v. Tweedie*, 294 A.2d 443 (Me. 1972), the Court considered the question of whether a statute governing pre-judgment interest was procedural or substantive. The Court observed that statutes establishing the "measure of damages" are a "matter of substance." *Id.* at 444. Procedural statutes, on the other hand, are those that "control the parties' conduct of the trial." *Id.* The Court concluded that pre-judgment interest is a procedural issue because the statute increases the defendant's liability for pre-judgment interest is increased if the defendant is responsible for delays during litigation, and because the statute tolls the accrual of interest when the plaintiff is responsible for delays. *Id.* at 444-45. In other words, the statute governing pre-judgment interest "exhibits a legislative intention to advance a remedial purpose, not to introduce new policy." *Id.* at 445. Thus, in the context of this issue, "remedial" refers not to a substantive compensatory remedy but rather to the procedure by which a remedy may be sought.

A statutory increase in allowable compensatory damages is unrelated to the conduct of the trial. Rather, it defines the rights and responsibilities of the parties involved in the claim. Further, while the legislative parameters on damages may be seen as "remedial" in the broader sense that damages are a form of remedy, that limitation is not "remedial" as the Law Court uses that term cases such as *Batchelder.* This conclusion is in accord with the majority view. *See* B.K. Carpenter, Annotation, *Retroactive Effect of Statute Which Imposes, Removes, or Changes a Monetary Limitation of Recovery for Personal Injury or Death*, 98 A.L.R.2d 1105, § 3

5

*and cases cited therein* (1964, Supp. 1993 & Supp. 1999).

The federal District Court for the District of Maine has predicted that the state courts would regard the 1996 amendment to be procedural rather than substantive. *Feighery v. York Hospital*, 38 F.Supp.2d 142, 156 (D. Me. 1999). This court respectfully disagrees with the analysis that led to that conclusion. The federal court noted that the increase in the limitation on damages "in no way changes any of the underlying rights or obligations of defendants." *Id.* However, the 1996 amendment to section 2-804 created a substantive right that allowed a recovery of up to $150,000, and it created a substantive potential liability of defendants in that increased amount.

Therefore, the court concludes that the amount of damages recoverable under section 2-804 is substantive in nature. As is noted above, the legislature has not clearly expressed an intent that changes in that amount shall apply to causes of action that arose prior to the effective date of that statute. Therefore, section 2-804 cannot be applied retroactively, and Barbara's damages for loss of Karen's comfort, society and companionship are limited by statute to $75,000.

**B.  Count 3 (separate NIED claims)**

**(1) Claims based on fatal injuries to Karen**

In addition to the section 2-804 claims brought by Barbara in her capacity as personal representative of Karen's estate, she, Robert and Jessica have each asserted separate claims for negligent infliction of emotional distress based on their presence when Karen sustained her fatal injuries. *See, e.g., Michaud v. Great Northern Nekoosa Corp.*, 1998 ME 213, ¶ 16, 715 A.2d 955, 959 (bystander recovery in favor of "indirect victim").

6

The defendants argue that these claims are foreclosed by the provisions of section 2-804. This issue requires the court to construe section 2-804. The Law Court has established the following principles of statutory construction: "When construing a statute, 'we look to the plain meaning of the language to give effect to the legislative intent.'. . . Additionally, we consider the statutory scheme as a whole in order to reach a harmonious result. . . .Lastly, '[w]e avoid statutory constructions that create absurd, illogical, or inconsistent results.' *Fairchild Semiconductor Corp v. State Tax Assessor*, 1999 ME 170, ¶ 7, 740 A.2d 584, 587 (internal citations omitted).

In its form applicable here, 18-A M.R.S.A. § 2-804(b) includes within its $75,000 limitation "any damages for emotional distress arising from the same facts as those constituting the underlying claim. . . ." The express purpose of the amendment that resulted in the inclusion of this language was to preclude the assertion of separate emotional distress claims by beneficiaries of a section 2-804 action, outside of the framework of that statute. *See* L.D. 795, 114th Leg., Statement of Fact (resulting in enactment of P.L. 1989, c. 340). In this case, the interested parties to Barbara's claim under section 2-804 are Barbara in her individual capacity, and Robert. *See* 18-A M.R.S.A. §§ 2-103, 2-106. Therefore, under the express language of section 2-804, Barbara and Robert cannot recover on a separate claim for NIED, beyond any recovery of $75,000 flowing from the loss of the Karen's comfort, society and companionship. Here, the parties have agreed that judgment shall be entered for Barbara, in her representative capacity, in the maximum amount allowed by section 2-804. This forecloses any further recovery for emotional distress by

Barbara or Robert resulting from Karen's death.

The remaining issue is whether Jessica, who is not a beneficiary of the section 2-804 claim, may pursue a separate NIED claim based on Karen's death. The statutory limitations on NIED claims brought by the heirs of a decedent evidence the legislature's intent to bar NIED claims brought by persons who are not the interested parties to a claim under section 2-804. Persons for whose benefit a section 2-804 claim is pursued include, based on a schedule setting out various priorities, the surviving spouse, the decedent's children, and statutorily designated heirs, which, under section 2-103, could include siblings, grandparents and other relatives. *See* 18-A M.R.S.A. §§ 2-103, 2-804(b). The court declines to construe section 2-804 as foreclosing a NIED claim that Karen's parents would otherwise pursue, yet allowing Jessica to maintain such a claim where, under the priority of claimants, the parents have a preferred level of standing.

The result urged by the plaintiffs is further weakened by the fact that under other circumstances (namely, if Jessica were the statutory heir to Karen's estate), Jessica's NIED would be expressly foreclosed: if Barbara and Robert had not survived Karen, then Jessica would be the beneficiary of the claim under section 2-804, and she would have been unable to pursue a NIED claim that would exceed a $75,000 recovery for the loss of her sister's comfort, society and companionship. The court declines to construe section 2-804 as permitting a NIED claim by someone in Jessica's position in situations such as this but fortuitously foreclosing it in others.

Therefore, the court concludes that Jessica cannot recover as an indirect victim based on Karen's fatal injuries.

## (2) Claims based on injuries to Barbara

Robert and Jessica seek recovery as indirect victims for NIED based on the injuries that they observed Barbara sustain. "[T]he 'indirect victim' who witnesses another person being harmed by a tortfeasor's negligent act may recover for serious mental distress only if '[t]he psychic injury may be deemed foreseeable when the plaintiff bystander was present at the scene of the accident, suffered mental distress as a result of observing the accidence and ensuing danger to the plaintiff, and was closely related to the victim.'" *Michaud*, 1998 ME 213, ¶ 16, 715 A.2d at 959 (citation omitted). "Serious emotional distress exists where a reasonable person normally constituted, would be unable to adequately cope with the mental stress engendered by the circumstances of the event. . . .The distress does not have to be manifested by objective symptomatology." *Town of Stonington v. Galilean Gospel Temple*, 1999 ME 2, ¶ 11, 722 A.2d 1269, 1272 (citations and internal punctuation omitted).

### (a) Jessica's claim

The trial record shows indisputably that Jessica was profoundly affected by her sister's death. On Jessica's behalf, however, Barbara and Robert also claim that Jessica's serious emotional distress was caused in part by her presence when Barbara was injured. In its essence, this claim is based on an allegation that Jessica's presence when Barbara was injured was a concurrent proximate cause of Jessica's serious mental distress.

To support a finding of liability, a concurrent cause must be a proximate cause. *Fournier v. Rochambeau*, 611 A.2d 578, 579 (Me. 1992). A proximate cause is a cause "which, in nature and continuous sequence, unbroken by an efficient intervening cause, produces the injury, and

9

without which the result would not have occurred." *Searles v. Trustees of St. Joseph's College*, 1997 ME 128, ¶ 8, 695 A.2d 1206, 1209. A tortfeasor's conduct is a "proximate cause of an injury only if 'the actor's conduct is a substantial factor in bringing about the harm.'" *Webb v. Haas*, 1999 ME 74, ¶ 20, 728 A.2d 1261, 1267 (citation omitted).

In determining whether a concurrent cause is a proximate cause, it is "important" to consider "the number of other factors which contribute in producing the harm and the extent of the effect which they have in producing" that harm. RESTATEMENT (SECOND) OF TORTS § 422(a) (1965). When an alleged injury-producing condition or event is "insignificant" in relation to other, more predominant causes, then the alleged conduct may be rendered less than substantial and thus not actionable. *Id.* cmt. d. In those cases where a claimant establishes several causative agents, then damages for the resulting harm is subject to apportionment where there is a reasonable basis to determine the relative contributions of each cause to the single injury. *Id.* § 433A(1). This apportionment process is available in cases where one cause exposes a tortfeasor to liability and one or more other causes are not the legal responsibility of that party. *Id.* cmt. e. If the harm cannot be apportioned, then "each of the causes is charged with responsibility for the entire harm." *Id.* 433A(2) and cmt. I; *see also Paine v. Spottiswoode*, 612 A.2d 235, 240 (Me. 1992).

Here, Jessica's bereavement counsellor testified that immediately after the accident and for an unspecified but apparently brief period of time, Jessica was afraid that Barbara's injuries were fatal. Plaintiff's exhibit 13, p. 17 (deposition testimony of Julie Frost-Pettengill). Jessica developed this apprehension because Karen's and Barbara's injuries caused

10

both of them to bleed, and the extent of Barbara's injuries were consequently unclear to Jessica. *Id.* At some point, the basis for Jessica's concerns about her mother's mortality evolved from Jessica's observations of her mother at the accident scene (and the understandably blurred line between Karen's fate and Barbara's condition), to a broader phenomenon that is part of psychic trauma. In that subsequent stage, the accident placed Jessica in a "zone of vulnerability," where she was more attentive to the risks that all people face in common situations. *See* Plaintiff's exhibit 15, p. 22-23 (deposition testimony of Jonathan Heeren, Ph.D.); Plaintiff's exhibit 13, pp. 36-37 (deposition testimony of Julie Frost-Pettengill). The development of those "general fears," however, is not of "great significance." Plaintiff's exhibit 15, p. 22 (Heeren deposition testimony).

The court concludes that Jessica's initial apprehensions that Barbara was fatally injured rise to the level of serious emotional distress. From the perspective of someone of Jessica's age and corresponding sensitivities, the emotional impact of observing her mother, who was injured in an incident which also gravely injuries her sister, would render her unable to adequately cope with the mental stress engendered by those circumstances. *See Town of Stonington*, 1999 ME 2, ¶ 11, 722 A.2d at 1272. Jessica's behavior subsequent to the accident demonstrates that Karen's death played a more profound and long-lasting effect on Jessica. Nonetheless, the court concludes that the emotional distress caused by Jessica's observations of Barbara's injuries at the accident site was a substantial and proximate cause of her serious emotional distress.

The next question is whether this harm sustained by Jessica can be apportioned from the harm Jessica sustained from her observations of

11

Karen at the scene. As is noted above, the court finds that Karen's fatal injuries caused substantially more emotional trauma to Jessica than did Barbara's injuries. This is revealed by evidence of the manner in which Jessica's emotional turmoil was addressed (bereavement counselling, which included group sessions with other children whose siblings had died) and the behavioral manifestations of her grief (for example, putting herself in physical danger so that she could be with Karen; creating funerals with her dolls). Further, the effects of Karen's death continue to this day. On the other hand, as is noted above, there is no meaningful evidence that after the passage of some time, when Jessica became assured that her mother would not die, the effects of her observations of Barbara's injuries at the accident scene were themselves the basis for serious emotional distress within the meaning of *Town of Stonington* and similar caselaw. Rather, that fear was transformed into more familiar and, according to Dr. Heeren, less worrisome expressions.

From these circumstances, the court finds that Jessica's emotional harm attributable to Barbara's injuries were less severe and not as extensive in duration as that caused by Karen's death. Therefore, the recoverable loss can be apportioned qualitatively from the emotional distress caused by the injuries to Karen. The court assesses $7,500 for Jessica's emotional distress caused by the injuries to Barbara.[4]]

### (b) Robert's claim

Robert's perceptions of and apprehensions generated by his observations of Barbara's injuries at the accident scene are qualitatively

---

[4]Because Jessica's NIED claim is so limited in scope, the PET records, which reflect issues that have not been causally linked to Jessica's observations of Barbara's injuries, lose relevance and have not been considered in this ruling.

12

different than those of Jessica. Despite the horrific circumstances at the scene, Robert -- as an adult -- was better equipped than Jessica to understand Barbara's immediate situation. Although Barbara's injuries were readily apparent, Robert was also able to watch Barbara summon an ambulance[5] and attempt to provide medical treatment to Karen. Further, he accompanied Barbara in the ambulance to a Bangor hospital. There, as at the scene, he was able to see that Barbara's injuries were significant but limited.

Further, despite the devastating loss caused by Karen's death, the evidence does not reveal any meaningful factual basis on which to conclude that Robert suffered from serious mental distress as a result of Barbara's injuries. Although Robert is reserved and Maine law does not require a showing of objective symptoms of serious mental distress, in the circumstances of this case, the court does not regard Barbara's injuries as sufficient to support a claim for NIED by one in Robert's position.

## C. Count 4 (personal injury claim of Barbara Carter)

Barbara sustained personal injuries in the accident. The rock that entered the passenger compartment of the Carter vehicle struck her left hand, grazed her face, and struck her left shoulder. She was transported by ambulance to a Bangor hospital. Although Barbara experienced considerable pain caused by the physical injuries, she delayed the use of pain medications so that she could spend time with Karen while medical

---

[5] With a clear sense of the magnitude of Karen's injuries, Barbara -- who is a registered nurse -- knew to make arrangements for a better equipped ambulance service to meet up with the local ambulance en route from the accident scene to a Bangor hospital. Accordingly, Karen was transferred between vehicles due to Barbara's remarkable judgment exercised in a situation that can be described only as a nightmare.

13

personnel attempted to treat Karen.

Later on the evening of the accident, surgery was performed on the ring and little fingers of Barbara's left hand. This was the first of four surgical procedures on the hand. Barbara was released from the hospital that night. As Barbara recovered from the injuries to her hand, the point of concern became limitations in her ability to move the injured fingers, particularly her small finger. Surgeries in January 1997 and April 1998, combined with physical therapy, resulted in considerable -- although not complete -- improvement. The limitations in motion prevented Barbara from extending her small finger and from bending it normally. Her orthopaedic surgeon stated that the former problem is largely cosmetic. Plaintiff's exhibit 7, p. 38 (deposition transcript of John Pyne, M.D.). However, because Barbara was unable to fully bend her small finger into her palm, her ability to grasp objects was affected. *Id.* Barbara's hand has improved as much as it will, but she is left with a modest impairment in the function of her left hand.

Apparently because Barbara and her providers focused on the injuries to her hand, treatment was not provided for her shoulder until early 1997.[6] Ultimately, the shoulder problem was diagnosed to be rotator cuff tendinitis. After several injections of cortisone in 1997, the problems in the shoulder lessened but were not fully alleviated.

At the time of the accident in 1996, Barbara, who is a registered nurse, was employed as a staff nurse at Winterport Family Practice. She worked 16 hours per week. Under directions from her physician, she was

---

[6]Despite this delay in treatment, the record establishes that Barbara's shoulder injury was caused by the June 3, 1996, accident.

14

out of work because of her injuries from the date of the accident until the middle of August 1996. When she returned to work, her injuries prevented her from carrying out the patient care responsibilities that had been assigned to her prior to the accident. However, her employer assigned different duties that, albeit with some difficulty, she was able to discharge. Subsequent to August 1996, Barbara lost additional time from work due to medical appointments associated with her injuries. Her lost wages amount to approximately $4,300.

Just as Barbara's injuries affected her work performance, she was unable to perform her homemaking tasks. She is Jessica's primary caretaker. Additionally, because Robert's primary job required him to be away from home half of the year in three week segments, prior to the accident, she was solely responsible for the children and the home when he was gone. As is discussed below in connection with Robert's claim for loss of consortium, he went on leave from his primary job after the accident until early 1997. The purpose of that leave was both to assume responsibility for much of the work around the house (including caring for Jessica) and to be with Barbara and Jessica in the wake of Karen's death. Robert's decision to stay closer to home demonstrates the extent of Barbara's incapacity due to her physical injuries.

Barbara describes herself as being "very much left handed." Thus, the injuries to her left hand and shoulder were more debilitating than if she were right handed or less dependent on her left hand. For the remainder of 1996, her injuries made it difficult for her to care for Jessica, to care for herself, to perform housework, to cook and to do other things outside of the house, such as grocery shopping and driving. Physical

15

relations with Robert were affected because of the pain caused by the injuries. To some extent, Barbara remains affected by those injuries. She is unable to engage in some activities, such as playing the guitar, that she did previously. Other activities that she enjoyed, such as sewing, are more difficult. Her shoulder is a source of chronic pain, although that condition does not warrant surgery. She has a prescription for pain medication, although she is reticent to take those drugs and generally confines herself to ibuprofin or similar medications. Because she reached a medical endpoint by November 1998, *see* Plaintiff's exhibit 7, p. 65 (Pyne deposition), there is no reasonable expectation that her condition will improve.

In December 1999, Barbara experienced cardiac problems which were caused by stress. By that time, she was well past the point of reaching her maximum recovery from the physical injuries resulting from the accident. On this record, the court cannot find that the cardiac condition is causally related to the sphere of the defendants' liability to her. Rather, the evidence indicates that this medical issue is related to the emotional distress caused by Karen's death. *See, e.g.,* Plaintiffs' exhibit 1(G) (March 23, 2000, letter from John H. Jentzer, M.D.).

Barbara's compensable medical expenses (which excludes expenses apparently associated with the cardiac condition) are roughly $25,500. In 1997, after Robert resumed his employment and was away for significant period of time, she incurred housekeeping costs of roughly $2,400. Her wedding ring was damaged in the accident.

For Barbara's personal injury claim, the court awards her $100,000.

**D. Count 5 (pecuniary loss claims of Barbara and Robert Carter)**

16

Barbara and Robert each seek recovery for special damages. These claims are predicated on theories of liability addressed elsewhere in this order, and the damages issues are considered in those contexts rather than separately here.

## E. Count 6 (claims for loss of consortium)

Barbara seeks recovery for the loss of Robert's consortium, and Robert seeks recovery for the loss of Barbara's consortium. A claim for loss of consortium is based on a tortious injury to the claimant's spouse that "detrimentally affects the spousal relationship." *Gayer v. Bath Iron Works Corp.*, 687 A.2d 617, 622 (Me. 1996). It is a vehicle to compensate the claimant spouse for the loss of material services, guidance, society, companionship, and conjugal relations. *Hardy v. St. Clair*, 1999 ME 142, ¶ 8 n.3, 739 A.2d 368, 371.

### (a) Barbara's claim

The evidence indicates that after the accident, Robert became withdrawn. As Barbara put in during her testimony, much of the fun and pleasure was drained from the marital relationship. For the reasons discussed in connection with Robert's NIED claim, the court is unable to find that the injuries to Barbara were the proximate cause of this result. Rather, this effect was the result of Karen's death. The resulting question is whether, in light of section 2-804, Barbara is permitted to recover for the damage to the marital relationship caused by the effect of Karen's wrongful death on her husband.[7]

---

[7]Robert did not sustain physical injuries in the accident. Therefore, Barbara was not deprived of material services provided by him, and the only basis for Barbara's consortium claim is the emotional impact of Karen's death on Robert as manifested in the marital relationship.

In *Hardy*, the Law Court held that the right to recover on a loss of consortium claim is not defeated by a release of claims executed by the spouse who was tortiously injured. 1999 ME 142, ¶ 12, 739 A.2d at 372. The Court reiterated prior case law that "consortium claims are separate, independent causes of action" and "that a wife's statutory right to bring a consortium claim 'belongs to the wife and is separate and apart from the husband's right to bring his own action against the party responsible for his injuries.'" *Id.*, ¶ 11, 739 A.2d at 372.[8] Title 18-A M.R.S.A. § 2-804(b) limits recovery in wrongful death actions to medical and funeral expenses incurred on behalf of the deceased, pecuniary loss caused by the wrongful death, and loss of the comfort, society and companionship of the deceased, "including any damages for emotional distress arising from the same facts as those constituting the underlying claim. . . ." It might be argued that although Barbara's own recovery for losses caused by Karen's death is limited by this statute, the statute does not foreclose an independent claim brought by Barbara for the loss of consortium resulting from the emotional impact of Karen's death experienced by Robert. In other words, if the basis for a consortium claim is not equivalent to any of the losses limited by section 2-804, then the statute would not impede Barbara's right to recover for that loss of consortium, even though her claims based more directly on Karen's death are limited or foreclosed altogether.

In *Purdy v. Kennebec Valley Medical Center*, 551 A.2d 858 (Me. 1988), in considering the extent of the statutory limitation on recovery for

---

[8]In *Hardy*, the Law Court recognizes a long-standing principle, apparently common law in its origins, that a husband has a right to recover for loss of consortium. 1999 ME 142, ¶ 8, 739 A.2d at 371. The court also noted that a wife's right to recover for loss of consortium occasioned by injuries to her husband is statutory in nature. *Id. See* 14 M.R.S.A. § 302.

18

claims arising out of a wrongful death, the Law Court reached a conclusion similar to the one urged here by the plaintiffs. As it stood at that time, section 2-804 set out the monetary limitations on actions for the loss of comfort, society and companionship of the deceased without the additional language referring specifically to emotional distress. The *Purdy* Court concluded that the statute did not foreclose a NIED action because emotional distress is a "different" form of damages than those specified in the statute. *Id.* at 860. The Court reasoned that a NIED claim was "separate from and independent of an action under the Wrongful Death Act." *Id.* at 859.

In response to *Purdy*, the legislature amended section 2-804 to expressly include emotional distress damages within the limits on recovery for the loss of comfort, society and companionship. P.L. 1989, c. 340. The legislative statement of fact explained the purpose of the statutory amendment and noted that *Purdy* would "permit plaintiffs to side-step the limitation of the wrongful death laws which were intended to establish a reasonable limit on the damages in wrongful death cases." L.D. 795, 114th Leg., Statement of Fact. Such legislative history is useful in construing a statute. *Arsenault v. Crossman*, 1997 ME 92, ¶7, 696 A.2d 418, 421. In the fact of *Purdy*, the legislature promptly reacted[9] with an explicit iteration of its intention to restrict recovery on claims arising out of wrongful deaths. The statement of fact associated with the 1989 amendment reveals a legislative policy that the statutory limitation is of comprehensive scope and goes beyond the narrow claims for loss of comfort, society and

---

[9] The Law Court issued its decision in *Purdy* in December 1988. The legislature considered and adopted the amendment to section 2-804 in its very next session.

19

companionship, even though the legislature specified those as the non-pecuniary losses to which the limitations would apply. Barbara's consortium claim ultimately rests on Karen's wrongful death: she seeks recovery for loss of consortium that, in turn, was caused by Karen's death. When section 2-804 is construed as broadly as the legislature has shown it should be construed, then it must be read to foreclose Barbara's consortium claim.

Although the legislature did not amend section 2-804 to expressly include consortium claims within the limitations created by that provision, the 1989 amendment was specifically responsive to a judicial ruling concerning NIED claims. Thus, the court does not view the legislative silence on consortium claims as indicative of an intent to allow such claims to go forward.

For these reasons, the court concludes that Barbara's claim for the loss of Robert's consortium is barred because that loss was proximately caused by Karen's death and was not caused by her own personal injuries.

**(b) Robert's claim**

At the time of the accident, Robert held several jobs. One of them involved a schedule in which he was away from home for three weeks and then off duty (and at home) for the next three weeks. From the date of the accident through early 1997, Robert took leave from that job so that he could spend more time at home with Barbara and Jessica. During those six months, however, he was able to work at the other two jobs he held prior to the accident. Despite his responsibilities in those two positions, Robert provided much of the material support that Barbara otherwise would have provided to the family and household: he did those things that Barbara's

injuries prevented her from doing. Robert testified that part of the reason he took leave from his employment with Bouchard Transportation was to stay with his family and provide emotional support in the wake of Karen's death. However, Barbara's incapacity also was a substantial factor in that decision.

The defendants argue that the measure of damages for this part of Robert's consortium claim is the value of the services he provided to Barbara and the household, rather than the net loss of income due to his decision to take leave from Bouchard Transportation. The plaintiffs do not appear to contest this position, even though they alternatively frame their damage analysis in terms of the lost wages. *See* "Argument and Memorandum of Law on Behalf of Plaintiffs" at p. 8, n.1. A claim for loss of consortium is designed to compensate a spouse for services that the injured party is unable to provide. *Hardy*, 1999 ME 142, ¶ 8 n.3, 739 A.2d at 371. Thus, recovery by the consortium claimant should be based on the value of those services that the injured spouse could not provide and that the claimant was required to render in her stead.[10]

Here, Robert was deprived of Barbara's homemaking services for roughly six months, between the date of the accident and late 1996 or early 1997. The nature of the work that Barbara could not provide include those discussed above in connection with Barbara's personal injury claim.

---

[10]In support of their position on this issue, the defendants rely on *Poirier v. U.S.*, 745 F.Supp. 23 (D.Me. 1990). There, the trial court noted that the consortium claimant left work in order to attend to her husband, who claimed to have been the victim of medical malpractice. The court then found that the value of the wife's services was $6.00 per hour. *Id.* at 32. It appears, but is not clear, that this was the value of the wife's services provided to the husband rather than to her employer. Regardless of this ambiguity, the doctrinal underpinnings of a consortium claim support the defendants' argument.

The record does not allow a precise quantification of the amount of services that Robert provided. However, the evidence shows that he performed most of the household work for six months, and it reveals the many different types of services he provided during that time, even though he was simultaneously able to maintain some level of employment. The court finds this to be an adequate basis on which to determine damages.

Further, as is also noted above, the quality of the marital relationship was affected by Barbara's physical injuries. In particular, the physical aspects of their marriage were harmed, and emotional distance grew between them. Although Karen's death surely played a part in this problem, Karen's physical limitations and her chronic pain was a substantial cause as well.

Based on this evidence, the court awards Robert $30,000 for loss of Barbara's consortium caused by her personal injuries.

The entry shall be:

For the reasons set out in the order dated June 15, 2001, on Barbara Carter's wrongful death claim, judgment is entered for Barbara Carter in the amount of $83,812.10.

On the separate claims of Barbara Carter, Robert Carter and Jessica Carter for negligent infliction of emotional distress due to the death of Karen Carter, judgment is entered for the defendants. On Robert Carter's claim for NIED due to the injuries to Barbara Carter, judgment is entered for the defendants. On Jessica Carter's claim for NIED due to the injuries to Barbara Carter, judgment is entered for Robert Carter and Barbara Carter, as parents and next friends of Jessica Carter, in the amount of $7,500.

On Barbara Carter's claim for personal injuries, judgment is entered

22

for Barbara Carter in the amount of $100,000.

On Robert Carter's claim for loss of consortium, judgment is entered for Robert Carter in the amount of $30,000. On Barbara Carter's claim for loss of consortium, judgment is entered for the defendants.

Pre-judgment interest shall be awarded at the statutory rate. The plaintiffs are awarded their costs of court.

Dated: June 15, 2001

_____
JUSTICE, SUPERIOR COURT

Date Filed June 1, 1998 _____ Waldo _____ Docket No. ___ CV-98-24 _____
County

Action_____ Auto Negligence _____


ROBERT H. CARTER and BARBARA A. CARTER,
Ind. and as parents and next friend of
JESSICA L. CARTER, and BARBARA A. CARTER,        KEVIN D. WILLIAMS and VAUGHN
Pers. Rep. Estate of KAREN ANN CARTER    vs.    THIBODEAU AND SONS, INC.

| Plaintiff's Attorney | Defendant's Attorney |
|---|---|
| Martha J. Harris, Esq.<br>P.O. Box 1451<br>Bangor, Maine 04402-1451<br>947-0191 | Carl F. Rella, Esq. for both Defts.<br>One Cumberland Place, Suite ~~308~~ 204<br>PO Box ~~696~~ 2700<br>Bangor, ME 04402-~~0696~~ 2700<br>Tel: ~~945-4720~~ 945-4722<br>  Shaun B. Lister, Esq. co-counsel |

| Date of Entry | |
|---|---|
| 6/1/98 | Complaint dtd. May 29, 1998, filed with Complaint Summary Sheet. Case file notice and pretrial scheduling statement to atty. Harris. |
| 7/6/98 | Acknowledgments of Receipt of copy of Complaint & Summons on behalf of both Defts. by Carl F. Rella, Esq. dtd. June 30, 1998, filed. |
| 7/7/98 | Defts' Answer to Plffs' Complaint dtd. June 6, 1998, filed. |
| 7/21/98 | Pretrial Scheduling Statement, filed. Jury trial requested. No fee paid. |
| 7/22/98 | Jury fee paid by deft. Receipt 10721. |
| 7/27/98 | Expedited Pretrial Order, filed. Discovery to be closed by July 1, 1999. This case will be placed on the jury trial list 30 days after close of discovery. This Order is incorporated into the docket by reference at the specific direction of the court. (Kravchuk, C.J. |
| 7/27/98 | Notice of entry and copy Order to attys. Harris and Rella. |
| 7/30/98 | Notification of Discovery Service by Deft. showing service of Deft. Vaughn Thibodeau's Interrogatories Propounded to Barbara Carter as Pers. Rep. of Estate of Karen Carter and Deft. Vaughn Thibodeau's Interrogatories Propounded to Barbara Carter on atty. Harris on July 29, 1998, filed. |
| 8/24/98 | Notification of Discovery Service by Plffs. showing service of Plffs' First Request for production of Documents Propounded to Deft. Vaughn Thibodeau & Sons and Kevin D. Williams on atty. Rella on Aug. 21, 1998, filed. |
| 8/26/98 | Notification of Discovery Service by Deft. showing service of Defts' Objections to Plffs' First Request for Production of Documents on atty. Harris on Aug. 25, 1998, filed. |
| 8/31/98 | Notification of Discovery Service by Plffs. showing service of Barbara Carter's on her own behalf and on behalf of estate, Answers to Interrogatories on atty. Rella on Aug. 28, 1998, filed. |