MAINE SUPREME JUDICIAL COURT                    Reporter of Decisions
Decision:    2020 ME 112
Docket:      Ken-19-406
Argued:      June 24, 2020
Decided:     September 17, 2020

Panel:      MEAD, GORMAN, JABAR, HUMPHREY, HORTON, and CONNORS JJ.

## LISA COWARD et al.

v.

## GAGNE & SON CONCRETE BLOCKS, INC., et al.

HUMPHREY, J.

[¶1]  In *Culbert v. Sampson's Supermarkets, Inc.*, 444 A.2d 433, 436-38 (Me. 1982), we adopted a three-factor test to be applied in bystander, or indirect, claims of negligent infliction of emotional distress (NIED) to determine whether a bystander's serious emotional distress was reasonably foreseeable and, thus, whether a defendant owed a legal duty to the bystander.[1]  The second of these factors, we later held, requires proof that the bystander "suffered serious mental distress as a result of contemporaneously perceiving the accident." *Cameron v. Pepin*, 610 A.2d 279, 284-85 (Me. 1992).  In this appeal,

---

[1]  The three factors adopted in *Culbert* for determining the foreseeability of a bystander's emotional injury are that the bystander "[(1)] was present at the scene of the accident, [(2)] suffered mental distress as a result of observing the accident and ensuing danger to the victim, and [(3)] was closely related to the victim." *Culbert v. Sampson's Supermarkets, Inc.*, 444 A.2d 433, 438 (Me. 1982).

2

we consider what constitutes contemporaneous perception of an accident in bystander NIED claims.[2]

[¶2] Thomas Coward, individually, and his wife, Lisa Coward, appeal from a partial summary judgment entered by the Superior Court (Kennebec County, *Stokes, J.*) in favor of Gagne & Son Concrete Blocks, Inc., on the Cowards' second amended complaint, which alleged, in part, claims of bystander NIED and loss of consortium.[3] The Cowards' claims arose out of an accident at their home involving Thomas's son, Philip Coward, who died after a one-ton load of rebar fell on him while an employee of Gagne & Son was unloading the rebar from a truck using a forklift. The Cowards contend that the trial court erred in entering summary judgment in favor of Gagne & Son, arguing that the court

---

[2] Here, because there is no dispute that the plaintiff bystander was present at the scene and closely related to the victim, the sole issue is the second factor—whether the plaintiff suffered serious emotional injury "as a result of contemporaneously perceiving the accident" involving serious injury to, and the death of, his son. *Cameron v. Pepin*, 610 A.2d 279, 284-85 (Me. 1992).

[3] The plaintiffs in the second amended complaint are Thomas Coward, who is the father of Philip Coward, both individually and in his capacity as personal representative of Philip's Estate; Lisa Coward, who is the step-mother of Philip and the wife of Thomas; and Philip's two sisters, Nicole and Jessica. In the complaint, the Estate alleges a claim of wrongful death, and the other plaintiffs variously allege claims of negligence, loss of consortium, and bystander negligent infliction of emotional distress (NIED). The court (Kennebec County, *Stokes, J.*) entered summary judgments in favor of Gagne & Son on Lisa's claim for loss of consortium and the claims for bystander NIED brought by Thomas, Lisa, and each of the sisters. The wrongful death claim was tried to a jury and resulted in a verdict for the Estate.

Thomas appeals from the summary judgment on his bystander NIED claim, and Lisa appeals from the summary judgment on her claim for loss of consortium. Lisa and the sisters do not appeal from the judgment entered on their bystander NIED claims.

"misappli[ed] . . . the contemporaneous perception factor" as articulated in our precedent regarding bystander actions. *See Cameron*, 610 A.2d at 284-85; *Culbert*, 444 A.2d at 438. They argue that Thomas contemporaneously perceived the accident involving his son because he heard the accident occur, arrived "seconds later," and witnessed his severely injured son die. We agree that, viewing the facts in the light most favorable to the Cowards, Thomas *did* "contemporaneously perceive" the accident, and we vacate the judgment.

## I. BACKGROUND

A.    Facts

[¶3]  The following facts are drawn from the summary judgment record and are viewed in the light most favorable to the Cowards as the nonprevailing parties. *See McCandless v. Ramsey*, 2019 ME 111, ¶ 4, 211 A.3d 1157.

[¶4]  At the time of the events at issue, Thomas owned a business that installed concrete floors and foundations. He operated the business out of his home in Monmouth and employed his son, Philip, as a foreman. Gagne & Son routinely made deliveries of concrete supplies to the business at Thomas's home in Monmouth.

[¶5]  On May 21, 2014, Thomas, Philip, and three other employees were at Thomas's home cleaning up and getting ready to go to a job site. At

4

10:25 a.m., an employee of Gagne & Son arrived at the site to deliver supplies. The delivery included 150 pieces of twenty-foot-long rebar, which weighed one ton and were being unloaded with a forklift. Although Thomas heard the delivery truck arrive, he was approximately 100 feet away from the delivery area. Thomas did not see the rebar being unloaded.[4]

[¶6] In the course of the delivery, the rebar fell off the forklift and landed on Philip. Thomas heard a loud bang, followed by screaming, and had the immediate thought that someone had dropped a barrel of oil. He ran to the location where he heard the commotion and arrived "within seconds." Thomas observed Philip lying face down, under the rebar, with blood "coming in and out of his mouth." After the rebar was lifted off of Philip,[5] Thomas rolled Philip onto his back and performed mouth-to-mouth resuscitation for thirty to fifty minutes. Philip never regained consciousness and, by the time EMTs arrived, Philip had died. For three hours after his death, Philip's body remained in the yard, awaiting the arrival of investigators from the Occupational Safety and Health Administration.

---

[4] Thomas was separated from the delivery area by a portable garage tent, a cluster of about twenty trees, and an eight-foot increase in elevation.

[5] Although the parties dispute who removed the rebar from Philip, the removal of the rebar is immaterial to our discussion regarding contemporaneous perception. *See infra* II.B.

[¶7]  By January 2015, Thomas had relocated to a camp in Bingham because he could not bring himself to continue living at his home in Monmouth where the accident had occurred.  Another woman eventually moved in with Thomas at the camp in Bingham, and Lisa thought that Thomas and the woman were having a romantic relationship.  Although Lisa felt physically and emotionally abandoned, she understood that Thomas needed to move out of the Monmouth house because of his emotional pain.

[¶8]  After approximately nine months, Thomas attempted to move back to the house in Monmouth, but he could not stay for more than one or two weeks before going back to the camp in Bingham.  Thomas eventually moved back to the Monmouth home, but he was still "angry" and threatened suicide several times.  In May 2017, Thomas filed for divorce from Lisa.

B.     Procedural History

[¶9]  The relevant procedural history in this case began on June 5, 2017, when the Cowards filed a second amended complaint.[6]  Their complaint included a claim for wrongful death filed by Thomas as personal representative

---

[6]  The Cowards filed the original complaint against Gagne & Son on April 19, 2016, and a first amended complaint on April 26, 2017.

of the Estate of Philip Coward, *see* 18-A M.R.S. § 2-804 (2018);[7] the bystander NIED claim filed by Thomas, individually; and the loss of consortium claim filed by Lisa. On October 31, 2017, Gagne & Son moved for partial summary judgment.[8]

[¶10] At a hearing held on April 4, 2018, Gagne & Son acknowledged that it was contesting Thomas's bystander NIED claim only on the grounds that Thomas had not contemporaneously perceived the accident involving his son, conceding that Thomas was both present at the scene of the accident and closely related to Philip. The parties also agreed that Lisa's claim for loss of consortium was derivative of Thomas's NIED bystander claim and that, if the court entered summary judgment on the bystander claim, then judgment would also be entered on the loss of consortium claim.[9]

[¶11] On April 11, 2018, the court entered summary judgment in favor of Gagne & Son on Thomas's bystander NIED claim and Lisa's loss of consortium

---

[7] Title 18-A was recodified as Title 18-C effective September 1, 2019, and the new statute governing wrongful death claims appears at 18-C M.R.S. § 2-807 (2020). *See* P.L. 2019, ch. 417, §§ A-3, F-1; P.L. 2019, ch. 402, §§ A-1, A-2, F-1.

[8] Gagne & Son did not seek summary judgment on the claim for wrongful death filed by Thomas in his capacity as the personal representative of the Estate of Philip Coward.

[9] Additionally, the Cowards conceded at the hearing that a portion of their claim for negligence, which sought damages for Thomas and Lisa's "emotional and physical distress," was duplicative of and subsumed by their respective bystander NIED and loss of consortium claims.

claim.[10]  As to the bystander claim, the court determined that, viewing the evidence in the light most favorable to the Cowards, Thomas "neither saw the accident nor understood what it was when he heard the noise," and therefore concluded that Thomas could not "meet the contemporaneous perception factor" for a bystander NIED claim.  The court expressed concern "about expanding the limits of bystander NIED recovery and making a factual determination of how close in time to the accident is 'close enough' to permit recovery."  Because the parties had agreed that Lisa's loss of consortium claim was derivative of Thomas's bystander claim, the court also entered summary judgment on her claim without reaching its merits.[11]  Thomas and Lisa now appeal from the summary judgment entered on Thomas's bystander NIED claim and Lisa's loss of consortium claim.  *See* 14 M.R.S. § 1851 (2020); M.R. App. 2B(c)(1).

---

[10]  The other claims on which the court entered summary judgment included a claim for punitive damages on all counts of the complaint and the bystander NIED claims filed by Lisa and each of Philip's two sisters.  The court denied Gagne & Son's motion for summary judgment as to the remaining portion of the negligence claim, which sought damages for Philip Coward's "conscious pain and suffering."

[11]  Following the entry of summary judgment, a jury trial was held in September 2019 on the remaining counts in the amended complaint, including the wrongful death claim filed by Thomas as the personal representative of Philip's Estate.  Following a jury verdict in favor of the Estate, the court entered judgment in the amount of $ 2,019,291 for the benefit of Philip's two surviving minor children and $10,601.50 to the Estate for funeral expenses, plus prejudgment and post-judgment interest.

## II. DISCUSSION

[¶12]   The issue we consider in this appeal is whether a bystander contemporaneously perceives an accident when the bystander hears an accident occur and then visually witnesses and becomes aware of the victim's injuries seconds later.  The Cowards contend that *Culbert* and its progeny do not require that Thomas demonstrate that he observed the accident as it occurred, arguing that "contemporaneous involvement in the immediate aftermath of an injury is sufficient to meet the contemporaneous perception factor under Maine law."  They argue that, because Thomas heard the accident as it happened and arrived at his son's location within seconds, Thomas contemporaneously perceived the accident.   Gagne & Son counters that although Thomas had experienced the "aftermath" of the accident, he "did not realize that Philip was injured when the injury-producing event occurred" and, thus, did not contemporaneously perceive the accident causing his son's death.

A.     Standard of Review

[¶13]  "We review a grant of summary judgment de novo and consider both the evidence and any reasonable inferences that the evidence produces in the light most favorable to the party against whom the summary judgment has been granted."  *Berry v. Mainestream Fin.*, 2019 ME 27, ¶ 6, 202 A.3d 1195

(quotation marks omitted). "Summary judgment is appropriate only when the parties' statements of material facts and the portions of the record referred to therein disclose no genuine issues of material fact and reveal that one party is entitled to judgment as a matter of law." *Id.* (quotation marks omitted). "When the material facts are not in dispute, we review de novo the trial court's interpretation and application of the relevant statutes and legal concepts." *Remmes v. Mark Travel Corp.*, 2015 ME 63, ¶ 19, 116 A.3d 466.

B.     Bystander NIED Claim

[¶14]   NIED claims, like all negligence claims, require a plaintiff to "set forth facts from which it could be concluded that (1) the defendant owed a duty to the plaintiff; (2) the defendant breached that duty; (3) the plaintiff was harmed; and (4) the breach caused the plaintiff's harm." *Curtis v. Porter*, 2001 ME 158, ¶ 18, 784 A.2d 18.  Although "there is no . . . general duty to avoid negligently causing emotional harm to others," we have recognized "a duty to act reasonably to avoid emotional harm to others in very limited circumstances," including in bystander NIED actions, which involve "indirect" victims.[12]  *Id.* ¶¶ 18-19; *see Culbert*, 444 A.2d at 436-38.  To aid in establishing

---

[12]   "[A] plaintiff is an indirect victim if the claimed negligence underlying the NIED claim was directed not at [the plaintiff], but instead at someone [the plaintiff] loved and to whom [the plaintiff]

the existence of such a duty in the circumstances of a bystander NIED claim, a bystander "must demonstrate that he [(1)] was present at the scene of the accident, [(2)] suffered serious mental distress as a result of contemporaneously perceiving the accident, and [(3)] was closely related to the victim." *Cameron*, 610 A.2d at 284-85. The scope and extent of this duty is also dependent on the consideration of "relevant policy implications," *id.* at 282, including "the necessity of avoiding both unlimited liability and liability out of all proportion to culpability," *id.* at 283. Thus, "the extent of the duty owed in claims for [NIED] involves striking a fair balance between the need to compensate foreseeable psychic injuries and the risk of imposing limitless liability." *Michaud v. Great N. Nekoosa Corp.*, 1998 ME 213, ¶ 15, 715 A.2d 955.

[¶15] As these requirements make clear, a bystander's claim for NIED is not a claim without limits. In addition to requiring that a bystander and the victim be "closely related," we have consistently applied both a spatial limitation (presence at the scene) and a temporal limitation (contemporaneous perception) to the scope of a defendant's duty in order to avoid the risk of imposing unlimited liability. *See, e.g.*, *Champagne v. Mid-Maine Med. Ctr.*, 1998

---

was close." *Champagne v. Mid-Maine Med. Ctr.*, 1998 ME 87, ¶ 6, 711 A.2d 842. In contrast, a direct victim is a plaintiff who "was the object of the defendant's negligent conduct." *Id.*

ME 87, ¶ 14, 711 A.2d 842; *Cameron*, 610 A.2d at 284-85; *Culbert*, 444 A.2d at 437-38. Our focus in this appeal is solely on the parameters of the temporal limitation.[13] Thus, we consider whether "contemporaneous perception" requires a bystander to witness and be instantly aware of the victim's injuries at the exact moment the injury is inflicted on the victim, as Gagne & Son urges, or whether, as the Cowards assert, a bystander's emotional harm may result from contemporaneously perceiving the accident and then witnessing the victim's injuries in the immediate aftermath of the injury-producing event.

1. Bystander NIED Precedent

[¶16] We begin by revisiting *Culbert* and *Cameron*, the two cases that clarified the standard for bystander NIED claims. In *Culbert*, a mother sought to recover damages from a baby food manufacturer and a supermarket for the emotional distress she suffered after she observed her child choke and gag on a "hard substance" contained in a jar of baby food. 444 A.2d at 433-34

---

[13] It is undisputed that Thomas and his son, Philip, were closely related, and we need not address that issue in this appeal. Further, although Gagne & Son has conceded that Thomas was present at the scene of the accident, we conclude in our de novo review of the summary judgment record that, viewing the facts in the light most favorable to the Cowards, Thomas was present at the accident scene. Thomas was at his home on the day of the accident and was located approximately 100 feet from the delivery area. Although we do not attempt to adopt a bright-line rule of 100 feet to establish a bystander's presence at an accident scene, Thomas's proximity to the injury-producing act of Gagne & Son and his ability to hear the accident occur are sufficient to demonstrate that he was "present at the scene of the accident." *Cameron*, 610 A.2d at 284.

(quotation marks omitted). The trial court dismissed claims against the manufacturer and entered a summary judgment in favor of the supermarket, concluding that the mother had not been a foreseeable victim because she had not been in the zone of danger. *Id.*

[¶17] We concluded that "the traditional tort concept of foreseeability [would] circumscribe . . . the tortfeasor's liability in bystander cases" and, as a result, adopted the three-factor test articulated in *Dillon v. Legg*, 441 P.2d 912 (Cal. 1968), "for determining whether an injury was reasonably foreseeable." *Culbert*, 444 A.2d at 437. Accordingly, we held that in some circumstances, "a bystander may recover damages for serious mental distress foreseeably resulting from witnessing another person harmed by the tortfeasor's negligent act," concluding that a bystander's "psychic injury may be deemed foreseeable when the plaintiff bystander [(1)] was present at the scene of the accident, [(2)] suffered mental distress as a result of observing the accident and ensuing danger to the victim, and [(3)] was closely related to the victim."[14] *Id.* at 438.

---

[14] In *Dillon v. Legg*, the Supreme Court of California defined these three factors as "guidelines" that would be used to help resolve "whether [a] defendant should reasonably foresee the injury to [a] plaintiff." 441 P.2d 912, 920 (Cal. 1968). In relevant part, the court defined the contemporaneous perception factor as "[w]hether the shock resulted from a direct emotional impact upon plaintiff from the sensory and contemporaneous observance of the accident, as contrasted with learning of the accident from others after its occurrence." *Id.* Later, in *Thing v. La Chusa,* the California court rejected the three "guidelines" in *Dillon* and applied a more restrictive three-factor test, holding that "a plaintiff may recover damages for emotional distress caused by observing the negligently inflicted injury of a third person *if, but only if*, [the] plaintiff (1) is closely related to the injury victim; (2) is

We also recognized that because "the imposition of liability is ultimately a factual determination which must be made on a case by case basis, the *Dillon* test should not be applied [formulaically] to bar arguably valid claims." *Id.* at 437. Thus, we vacated the dismissal and the summary judgment and remanded the matter for further proceedings in the trial court. *Id.* at 438.

[¶18] A decade later, in *Cameron*, we reviewed a bystander NIED claim brought by parents who were not present at the scene of a car accident involving their son, but who were notified of the accident "shortly after it occurred" and then arrived at the hospital to see their son "cut, bloody, and battered." 610 A.2d at 280. The parents remained with their son at the hospital until he died, six days later. *Id.* There, the "essential issue" that we considered was "whether a person, *not at the scene* when an accident occurs but who

---

present at the scene of the injury producing event at the time it occurs *and is then aware* that it is causing injury to the victim; and (3) as a result suffers serious emotional distress—a reaction beyond that which would be anticipated in a disinterested witness and which is not an abnormal response to the circumstances." 771 P.2d 814, 829-30 (Cal. 1989) (emphases added) (footnotes omitted); *see also Bird v. Saenz*, 51 P.3d 324, 328 & n.3 (Cal. 2002) (describing the *Thing* contemporaneous awareness requirement as requiring a bystander to perceive the "impact on the victim" and to "then know it is causing injury," but not permitting recovery when the "knowledge is acquired moments later").

Here, the parties dispute whether our reliance on the reasoning in *Thing*, 771 P.2d 814, when we explained our later holding in *Cameron*, 610 A.2d at 284-85, amounted to us adopting the narrow holding of *Thing*. It did not. To be sure, we were "persuaded by the reasoning of the *Thing* court to resist any expansive application of the standard adopted in *Culbert*" when concluding that a defendant's duty was limited by policy considerations. *Cameron*, 610 A.2d at 284. However, we did not expressly adopt *Thing*'s holding and, as we stated in *Cameron*, we "reaffirm[ed]" our holding in *Culbert*. *Id.* at 284-85; *see Thing*, 771 P.2d at 829-30.

14

subsequently witnesses the accident victim's pain and suffering, can recover for severe emotional distress against the defendant who negligently caused the accident." *Id.* (emphasis added). In considering that question, we also addressed the parents' contention that the *Culbert* standard had evolved into to a "pure foreseeability" test, "dependent *solely* on the factfinder's determination whether the injury was a reasonably foreseeable consequence of the defendant's negligence." *Id.* at 281, 284.

[¶19] We concluded, first, that a defendant's duty is informed not only by the foreseeability of the harm, but also by relevant policy considerations, including "the necessity of avoiding both unlimited liability and liability out of all proportion to culpability." *Id.* at 282-83. In rejecting the "pure foreseeability" standard urged by the parents, we also recognized that "the scope of the defendant's duty should be limited to the emotional vulnerability that arises in parents upon actually witnessing their child receiving an injury." *Id.* at 284. We reasoned that "[t]he impact of such an experience"—that is, of a bystander witnessing the victim receiving an injury while the bystander is at the accident scene—"is qualitatively and quantitatively different from the distress occasioned by a subsequent visit to the hospital." *Id.* Therefore, in the circumstances of *Cameron*, where the parents were not present at the accident

scene and had observed their son's pain and suffering only after arriving at the hospital, we "resist[ed] any expansive application of the standard adopted in *Culbert*" and, relevant to our discussion here, "reaffirm[ed] that a plaintiff must demonstrate that he . . . suffered serious mental distress as a result of contemporaneously perceiving the accident." *Id.* at 284-85.

[¶20] As these two cases make clear, we have focused our analysis in these NIED claims on a bystander's presence at the accident scene and the corresponding ability to be aware of the victim's injuries while the bystander and victim are at the scene. Thus, we recognized a "qualitative[] and quantitative[]" difference between the emotional distress suffered by a bystander who is at the scene and observes the victim's injuries and that distress experienced by a bystander who witnesses a victim's later pain and suffering away from the scene, after the accident has concluded. *Id.* at 284; *see also Dillon*, 441 P.2d at 920 (recognizing the different emotional distress experienced by a bystander when "learning of the accident from others after its occurrence"). Although we have not expressly defined the term "contemporaneous perception," we have confined this temporal limitation to instances in which a bystander is in close proximity to the accident and "witness[es] another person harmed," *Culbert*, 444 A.2d at 438; "observ[es] the

accident and ensuing danger to the victim," *id.*; or "witness[es] [the victim] receiving an injury," *Cameron*, 610 A.2d at 284. As such, this temporal limitation extends to a bystander's perception of the injury or harm suffered by a victim at the scene but does not permit recovery where a bystander views or learns of the same injury or harm at the hospital or otherwise away from the accident scene.

[¶21] Contrary to the contention of Gagne & Son, we have not expressly required that a bystander who witnesses the injury-producing event must, at that moment, possess an immediate knowledge that the event is causing harm to a victim. Indeed, in other instances, we recognized that a bystander's "contemporaneous *involvement in all that went on*" at the scene over a span of more than three hours was sufficient to state a claim for NIED. *See Purty v. Kennebec Valley Med. Ctr.*, 551 A.2d 858, 859-60 (Me. 1988) (emphasis added); *see also Culbert*, 444 A.2d at 438 (discussing the "*ensuing danger* to the victim" (emphasis added)); *but see Champagne*, 1998 ME 87, ¶ 14, 711 A.2d 842 (concluding that a bystander could not establish a claim for bystander NIED in part because the bystander did not became aware of the victim's injury until *one hour* later). Although the contemporaneous perception factor must impose a temporal limit on a bystander's NIED claim, that limit is not as narrow as the

one urged by Gagne & Son. In short, we are not persuaded to adopt the rule proposed by Gagne & Son that would define "contemporaneous perception" as meaning that a bystander is required to directly witness the injury-producing event and be immediately aware that it is causing injury to the victim.

[¶22] Therefore, we seek to clarify and define the temporal limits of what is required for a bystander to "*contemporaneously* perceive[e] [an] accident." *Cameron*, 610 A.2d at 284-85 (emphasis added).

2.    Contemporaneous Perception

[¶23] To begin, we conclude, as have other courts, that a bystander's contemporaneous *perception* of an accident includes the awareness of an accident that arises from any of a person's senses, not only sight.[15] *See, e.g.*, *Clohessy v. Bachelor*, 675 A.2d 852, 863 (Conn. 1996) (requiring a "contemporaneous *sensory* perception" (emphasis added)); *Folz v. State*, 797 P.2d 246, 260 (N.M. 1990) (same); *Neff v. Lasso*, 555 A.2d 1304, 1313 (Pa. Super. Ct. 1989) ("It is the immediate sensory awareness and not the source (*i.e.* visual, tactile, aural, gustatory or olfactory)[] of the awareness which must control."). Accordingly, we must recognize that when a bystander does perceive an

---

[15] *See Perceive*, American Heritage Dictionary of the English Language (5th ed. 2016) (defining "perceive" as "[t]o become aware of (something) directly through any of the senses, especially sight or hearing").

accident through a sense other than sight—in this case, by *hearing* a "loud bang" and screaming—there will undoubtedly be some brief moment of time that elapses between when the bystander hears or otherwise perceives the sound of an accident occurring and when the bystander then becomes aware of what it was that the bystander has heard. *See, e.g.*, *Groves v. Taylor*, 729 N.E.2d 569, 571-73 (Ind. 2000) (holding that a sister could recover for NIED when she heard a car accident occur and then turned around to witness "her brother's body as it rolled off the highway"). In such instances, we also must recognize the distinction between the initial injury-producing event that a bystander may hear and the immediate aftermath of such an event that a bystander may then see.[16] Therefore, in order to "strik[e] a fair balance between the need to compensate foreseeable psychic injuries and the risk of imposing limitless liability," *Michaud*, 1998 ME 213, ¶ 15, 715 A.2d 955, we must confine the amount of time that may elapse between a bystander's initial perception of the injury-producing event and the bystander's direct observation of the injuries and, thus, limit those circumstances that may be included within the contemporaneous perception of an event.

---

[16] When discussing the term "injury-producing event," we define that term as the moment when an injury is first inflicted on a victim. Thus, in this case, the injury-producing event occurred when the load of rebar fell and struck Philip.

[¶24]   The Cowards urge us to adopt the rule from *Eskin v. Bartee*, 262 S.W.3d 727, 739 (Tenn. 2008).  There, after a mother received a telephone call informing her that her son "had been hurt" as a result of being struck by a car, the mother drove to the scene of the accident.  *Id.* at 730-31.  Upon arriving at the scene, the mother witnessed her injured son "lying on the pavement in a pool of blood."  *Id.* at 730.  In ruling on the mother's NIED claim, the court concluded that it was "appropriate and fair to permit recovery of damages" for those plaintiffs "who arrive at the scene of the accident while the scene is in essentially the same condition it was in immediately after the accident."  *Id.* at 738.   Thus, the court held that, "[w]hen a plaintiff did not witness the injury-producing event," a plaintiff must prove, in part, an "observation of the actual or apparent death or serious physical injury at the scene of the accident *before the scene has been materially altered*."  *Id.* at 739 (emphasis added); *see also Hegel v. McMahon*, 960 P.2d 424, 429 (Wash. 1998) (allowing recovery when a bystander "observ[es] an injured relative at the scene of an accident after its occurrence and before there is substantial change in the relative's condition or location"); *Roitz v. Kidman*, 913 P.2d 431, 433 (Wyo. 1996) ("Once the victim's condition or location has materially changed . . . the moment of

crisis for which recovery is allowed is deemed to have passed . . . .” (quotation marks omitted)).

[¶25]  Although the rule expressed in *Eskin* does impose a limitation on a bystander’s perception of the immediate aftermath of an injury-producing event, the law as applied in the circumstances of that case does not square with our view.  First, the mother was not present at the scene when the injury was inflicted on her child and, thus, was unable to contemporaneously perceive through any of her senses the injury-producing event.  Second, we find this rule too broad and potentially ambiguous when applied.  A rule that requires a determination of whether the accident scene had been “materially altered,” *Eskin*, 262 S.W.3d at 739, is inherently vague and could expand recovery to those bystanders who, like the mother in *Eskin*, learn of a relative’s injuries through a phone call or other indirect means, but are still permitted to recover so long as the accident scene has not been altered. *Cf. Cameron*, 610 A.2d at 280, 284-85.

[¶26]  More instructive are those cases, like here, where a bystander is present at the scene, hears—but does not see—the injury-producing event, and then directly observes an injured relative moments later.  In *Groves v. Taylor*, where a brother and sister walked down their driveway toward the road to

check their family's mailbox, the sister turned her back and began to walk back up the driveway as the brother crossed the road to reach the mailbox. 729 N.E.2d at 571. The sister then heard a "big pop" as a vehicle struck the brother and turned around to see "her brother's body as it rolled off the [road]." *Id.* (quotation marks omitted). There, in permitting the sister to recover for her emotional distress, the court concluded that the sister's aural perception of the car accident and visual perception of the resulting injuries moments later were sufficient for her to have "witnessed or c[o]me on the scene soon after the death or severe injury of a loved one." *Id.* at 573; *see also Bennett v. Wal-Mart Stores E., L.P.*, 2018 U.S. Dist. LEXIS 49120, at *8 (W.D. Pa. Mar. 26, 2018) (concluding that a mother had contemporaneously perceived an accident when she "heard a 'commotion,' and turned back [toward her daughter] to discover her daughter on her hands and knees on the floor, crying loudly").

[¶27]  Similarly, in *Corso v. Merrill*, a mother and father were in their kitchen when their child was struck by a car fifty feet away from their home. 406 A.2d 300, 302 (N.H. 1979). The mother heard a "terrible thud" at the moment of the car accident and then looked outside to see her child "lying seriously injured in the street in front of the house." *Id.* (quotation marks omitted). The father, upon hearing the mother scream, "immediately ran out

22

the door" and witnessed his injured child. *Id.* In recognizing that a bystander's "emotional injury must be directly attributable to the emotional impact of the plaintiff's observation or contemporaneous sensory perception of the accident and immediate viewing of the accident victim," the court concluded that the mother's "auditory perception and her immediate observance of the accident" were sufficient to state a claim for NIED and that the father's perception of the accident was "so close to the reality of the accident as to render his experience an integral part of it." *Id.* at 306-07 (alteration omitted) (quotation marks omitted); *see also Acosta v. Castle Constr., Inc.*, 868 P.2d 673, 673-75 (N.M. Ct. App. 1994) (vacating a summary judgment entered against a brother working at a construction site who "heard a series of screams," immediately ran towards the location of the screaming, and, seconds later, observed "his brother's mouth and nostrils . . . still smoking as a result of his brother's electrocution").

[¶28] After reviewing these cases and the reasoning articulated by other courts, we are persuaded that a bystander may recover for a claim of NIED when, as here, that bystander hears an accident occur and then in its immediate aftermath witnesses a close relative severely injured. Therefore, we hold that, when a bystander does not directly *see* an injury-producing event in the

moment the injury is first inflicted on the victim, the bystander, if present at the scene, may nonetheless "contemporaneously perceive[e] the accident," *Cameron*, 610 A.2d at 284-85, through a sensory perception of the injury-producing event as it occurs and an observation of the victim's injuries or death in the immediate aftermath of that event. To establish that the bystander's observation of the victim's injuries occurred in the immediate aftermath of the injury-producing event, a bystander must demonstrate that the bystander perceived the injuries or death of the victim as an immediate result of the bystander's initial nonvisual perception of the injury-producing event.[17] Although we do not adopt a specific amount of time within which a bystander must witness the victim's injuries or death, it is clear that when a bystander hears the injury-producing event as it occurs and only seconds later witnesses the victim dead or severely injured, this brief amount of time is sufficiently immediate to fall within this temporal limitation. *See Groves*, 729 N.E.2d at 571, 573; *Corso*, 406 A.2d at 302, 307; *Acosta*, 868 P.2d at 673-75.

---

[17] To further clarify, the "immediate aftermath" of the injury-producing event does not include a bystander's perception of the victim's pain and suffering away from where the accident occurred, nor does it include those situations where the bystander does not perceive, in any manner, the occurrence of the injury-producing event and learns of the event only through other, indirect means. *See Champagne*, 1998 ME 87, ¶ 14, 711 A.2d 842; *Cameron*, 610 A.2d at 280, 284-85; *see also Clifton v. McCammack*, 43 N.E.3d 213, 221-23 (Ind. 2015); *Contreras v. Carbon Cnty. Sch. Dist. No. 1*, 843 P.2d 589, 593-94 (Wyo. 1992); *Wilder v. Keene*, 557 A.2d 636, 639 (N.H. 1989).

[¶29]  We do not here create an "expansive application" of the standard adopted in *Culbert* and *Cameron*, nor do we disregard "the necessity of avoiding both unlimited liability and liability out of all proportion to culpability." *Cameron*, 610 A.2d. at 283-285.  Rather, we recognize that "[w]itnessing either an incident causing death or serious injury or the gruesome aftermath of such an event . . . is an extraordinary experience, distinct from the experience of learning of a family member's death through indirect means."  *Bowen v. Lumbermens Mut. Cas. Co.*, 517 N.W.2d 432, 444-45 (Wis. 1994).

3.     Thomas Coward's Bystander NIED Claim

[¶30]  Here, the summary judgment record demonstrates that, at the time of the injury-producing event—the rebar falling on Philip—Thomas heard a "loud bang" followed by screaming and then ran to the scene.  Although Thomas did not see or become aware of the exact nature of the injury-producing event or the injuries inflicted on Philip at the moment they occurred, he responded immediately and arrived "within seconds" to witness his severely injured son, after which he attempted to keep his son alive for approximately thirty to fifty minutes.  Thus, Thomas immediately responded to the scene after hearing the screaming, without being informed by others of what had transpired.  In short, although Thomas was not instantaneously aware that the rebar had fallen and

inflicted severe injuries on his son, his perception of the injury-producing event and "contemporaneous involvement in all that went on," *Purty*, 551 A.2d at 860, in the immediate aftermath of the rebar falling on Philip was "qualitatively and quantitatively different" than that emotional distress suffered by a bystander who perceives a close relative's injuries or pain and suffering away and apart from the accident scene, *see Groves*, 729 N.E.2d at 571, 573; *Corso*, 406 A.2d at 302, 307; *Acosta*, 868 P.2d at 673-75; *cf. Cameron*, 610 A.2d at 280, 284-85, or after having been called to the scene by another, *cf. Eskin*, 262 S.W.3d at 739.

C.    Conclusion

[¶31]    In sum, we reaffirm that a bystander can establish that an emotional injury was foreseeable by demonstrating that the bystander "[(1)] was present at the scene of the accident, [(2)] suffered serious mental distress as a result of contemporaneously perceiving the accident, and [(3)] was closely related to the victim." *Cameron*, 610 A.2d at 284-85. We hold, in accordance with the reasoning articulated above, that in those instances where a bystander did not visually perceive the event that first inflicted the injury on a victim, the bystander may nonetheless satisfy the "contemporaneous perception" element by demonstrating that he otherwise perceived that event as it occurred and then witnessed the immediate aftermath of that event.

[¶32]   We conclude that the trial court erred in entering a summary judgment for Gagne & Son on Thomas's bystander NIED claim because, viewing the evidence in the light most favorable to Thomas, Gagne & Son was not entitled to a judgment as a matter of law.  We therefore remand the matter to the trial court with instructions to deny the motion for summary judgment on Thomas's claim.  Because Lisa's claim for loss of consortium was derivative of Thomas's bystander claim, we likewise vacate the summary judgment as to her claim for loss of consortium and remand with the same instructions.

The entry is:

> Summary judgment vacated as to Thomas's bystander NIED claim and Lisa's claim for loss of consortium.  Remanded for the court to deny the motion for summary judgment as to these two claims and for further proceedings consistent with this opinion.

---

Jason Dionne, Esq. (orally), Isaacson & Raymond, P.A., Lewiston, for appellants Lisa Coward and Thomas Coward

J. William Druary, Jr., Esq., and Gregory M. Patient, Esq. (orally), Marden, Dubord, Bernier & Stevens, PA LLC, Waterville, for appellee Gagne & Sons Concrete Blocks, Inc.

Kennebec County Superior Court docket number CV-2016-73