STATE OF MAINE
ANDROSCOGGIN, ss

SUPERIOR COURT
DOCKET NO. CV-15-081

Dwain Coughlin, *individually and* )
*As Personal Representative of* )
The Estate of Destiny Marie Crockett, )
)
*Plaintiffs,* )
)
v. )
)
Michael Peterkin, M.D. *and* )
Anesthesia Associates of )
Lewiston-Auburn, P.A., , )
)
*Defendants.* )

MAY 10 '21 AM8:05
ANDRO SUPERIOR COURT

**Order on Summary Judgment**

In his complaint, Plaintiff seeks damages individually and as personal representative as a result of the death of Destiny Crockett. He alleges that she died as a result of Defendants' medical negligence during her labor and delivery on April 20, 2014. The case comes before the court on Defendants' motion for partial summary judgment on a number of issues. The motion is opposed by Plaintiff. Upon review of the motion and opposition thereto, together with all the supporting documentation, the court orders as follows.

### Factual and Procedural Background

The following undisputed facts are properly before the court, drawn from the record.

Destiny Crockett died on April 26, 2014 after giving birth to Jayden at Central Maine Medical Center (CMMC). She is survived by Jayden as well as her daughter Tianna, who was 9 years old at the time. Plaintiff Dwain Coughlin is Jayden's father; he lived together with Ms. Crockett at the time of these events.

Ms. Crocket was admitted to CMMC on April 20, 2014 in labor at about 6 p.m. Dr. Peterkin, an anesthesiologist employed by Anesthesia Associates of Lewiston-Auburn, was called in later that evening to assist in placing an epidural catheter. After the epidural was

1

placed, Mr. Coughlin remained with Ms. Crockett for about 10 minutes; he left at about 9:44 p.m. to check on their dogs. After Mr. Coughlin left, Ms. Crockett began to experience shortness of breath, and Dr. Peterkin was called back to her room. She began to lose consciousness and at approximately 10 p.m. a code was called. At about 10:04 or 10:05 p.m., Dr. Peterkin attempted to intubate her. Plaintiff alleges that the endotracheal tube was not properly placed, leading to hypoxia, irreversible neurologic injury and ultimately Ms. Crockett's death on April 26, 2014. Plaintiff alleges that it was Dr. Peterkin's negligence that caused this tragic chain of events.

After he left to check on the dogs, Mr. Coughlin returned to the hospital about a half hour later (approximately 10:15) and was escorted immediately to Ms. Crockett's room. He was not allowed to enter the room, however, and remained outside of it. He was advised after about 4 hours that there had been complications and was asked if he wanted to see Jayden.

Plaintiff brought a four-count complaint arising out of Ms. Crocket's death. Count I asserts a claim for wrongful death pursuant to 18-A M.R.S. § 2-804, seeking both pecuniary and non-pecuniary damages. Count I specifically alleges that the pecuniary damages include loss of Ms. Crockett's services, instruction, advice, counsel, parental training, care, guidance, assistance, protection, and attention to the physical, moral and educational welfare of her minor children. *Complaint*, ¶ 41. It further alleges that the beneficiaries have also suffered non-pecuniary damages, including loss of comfort, society, companionship and emotional distress. *Complaint*, ¶ 42. Finally, Count I alleges the Estate has incurred medical, surgical, hospital care, treatment and funeral expenses. *Complaint*, ¶ 43.

Count II is a claim for Ms. Crockett's pain and suffering, emotional distress and loss of enjoyment of life prior to her death.

Count III is a claim by Dwain Coughlin individually for negligent infliction of emotional distress, a bystander claim arising out of Defendant's alleged negligent treatment of Ms. Crockett.

Finally, Count IV asserts a claim against Anesthesia Associates of Lewiston-Auburn under a *respondeat superior* theory for Dr. Peterkin's actions.[1]

Defendants moved for partial summary judgment on Counts I, II, and III of the Complaint. Specifically, Defendants assert they are entitled to judgment in their favor on the entirety of Counts II and III. Defendants also assert they are entitled to partial judgment in their favor on Count I as to any claim for loss of future income. Finally, Defendant's argue that the damages claimed in Count I in paragraphs 41 and 42 of the Complaint are all non-pecuniary damages and therefore subject to the statutory cap contained in 18-A M.R.S. § 2-804.

As detailed below, the court grants partial summary judgment for Defendants on Counts II and III of the Complaint. The court also grants the motion as to the damages alleged in paragraphs 41 and 42 of the Complaint. However, there is a genuine issue of material fact as to the claim for loss of future income, and therefore the motion is denied on that issue.

### Summary Judgment Standard

The standard for summary judgment is well known. On a motion for summary judgment, the court reviews the parties' statements of material facts and the record referred to therein to determine whether there is a genuine issue of material fact. Absent a genuine issue of material fact, a party is entitled to judgment as a matter of law on that issue. *E.g., Coward v. Gagne & Son Concrete Blocks, Inc.,* 2020 ME 112 ¶ 13; *Tri-Town Marine, Inc. v. J.C. Milliken Agency, Inc.,* 2007 ME 67, ¶ 7, 924 A.2d 1066, 1069. A material fact is one that can affect the outcome

---

[1] Originally CMMC was also a defendant but it has been dismissed from the case.

3

of the case; it exists if the court must choose between competing versions of the truth. *City of Augusta v. Attorney General*, 2008 ME 51 ¶ 20.

## Conscious Pain and Suffering

Pursuant to the Wrongful Death statute, "[w]henever death ensues following a period of *conscious* suffering" as a result of personal injury, a negligent person "who caused the personal injuries resulting in such *conscious* suffering and death" may be held liable. 18-A M.R.S. § 2-804 (2014) (emphasis added).[2] A claim for conscious pain and suffering "demands a factual determination that the decedent experienced a period of conscious pain and suffering prior to death." *Beale v. Chisholm*, 626 A.2d 345, 347 (Me. 1993).

In this case, Plaintiff rests his claim that the decedent experienced a period of conscious pain and suffering upon the expert testimony of Paul Currier, M.D. There is no witness who contemporaneously observed Ms. Crockett to be conscious or in pain. Dr. Currier's testimony is based on the medical records regarding the CPR administered to Ms. Crockett as well as her elevated blood pressure. Essentially, he testified in his deposition that he believed Ms. Crockett "presumably" experienced significant pain from chest compressions, as evidenced by her high blood pressure and heart rate at that time. He initially opined that her high blood pressure was a stress response, probably the result of the CPR because she was "cognizant", "aware" and "cognitively awake".[3]

---

[2] The wrongful death statute is now codified at 18-C M.R.S. § 2-807(3). The version of the wrongful death statute in effect at the time of the incident governs recovery of damages. *Carter v. Williams*, 2002 ME 50, ¶7, 792 A.2d 1093, 1097. On this issue, the language quoted herein has not changed.

[3]  Q. Do you think the CPR affected Ms. Crockett negatively in any way?
   A. Other than causing her pain, I think – so yeah, I guess I would say I do think it affected her negatively. *Presumably* she experienced significant pain from the chest compressions at the onset of the CPR.
   . . . .

4

Despite that testimony – which was scattered with qualifiers such as "I suspect" – when asked about it later in the deposition he retreated and made it clear that it would be speculation to try to describe what she was feeling or whether she was cognitively awake:

Q. I think you said that when the BPs and the pulses were high, the 2204:08 and 2205, I think you said that you thought she was cognitively awake?
A. That's true.
You know, I think that is -- that's speculative. I would say my – she at least had sufficient cognitive, I suspect, ability to sense she was in distress.
Q. But in terms of what she was feeling, that would be speculation?
A. It is speculative. Absolutely, yes.
Q. Okay. We know that the baby was delivered at 2219.
So she was not cognitively awake at that point, correct?
A. You know actually, I have to say, too, I think we don't know.
Q. Okay. All right.
So any - - any testimony whether she was cognitively awake, what she may have been feeling, would be speculative?
A. Correct.

---

A. And, you know, *I suspect* at this time that she is – because I believe chest compression had been started at this point, and I suspect that – again, *this is hypothesis to some degree* – but *I suspect* that her blood pressure is so high and heart rate is so high because she is enduring the stress of CPR when she is, in fact, still at least cognizant and aware of this.

. . . .

A. Again, I think [high blood pressure is] probably the stress of doing CPR on a person who does not need it, because she's cognitively awake.

. . . .

Q. And her maternal heart rate at this point, measured by the NIBP, is 222.
What does that tell you?
A. Again, that there is a high stress response.

. . . .

Q. And you said that part of the distress would be from the force of the CPR?
A. Correct.
Q. And – I'm sorry. Go ahead.
A. And also likely from oxygen deprivation.
Q. Right.
But can the force of CPR cause an increase in blood pressure and pulse?
A. So the – the force from the CPR could – can augment the blood pressure. Not to that degree, though. That degree really speaks to me to say that she has some of those, of her own inner fight-or-flight hormones, her own inner adrenaline is starting to surge because of distress, likely because of both CPR and the lack of oxygen.

*Currier Deposition*, cited in Plaintiff SMF, at page 16, line 20 – page 17, line 2; page 79, lines 5 – 12; page 80, lines 4 - 6; page 84, lines 6 – 10; page 111, lines 5-20.

5

*Currier Deposition*, cited in Defendant SMF, at page 112, line 4 – page 113, line 1. Defendants assert that because the only possible evidence of conscious suffering is speculative, they are entitled to summary judgment in their favor. The court agrees.

The wrongful death statute specifically requires Plaintiff to prove that any suffering was experienced consciously. The court must give meaning to each word. The use of the word "conscious" in the statute suggests there must be an element of perception and understanding of suffering and pain, not merely a documented response to painful stimuli. Dictionary definitions of "conscious" include "[p]ossessing sufficient power of mind to understand the real nature and true character of one's acts", *Ballantine's Law Dictionary* (2010), and "mental faculties not dulled by sleep, faintness, or stupor…[or] perceiving, apprehending, or noticing with a degree of controlled thought or observation." *https://www.merriam-webster.com/dictionary/conscious?src=search-dict-hed*. Even considering the portions of Dr. Currier's testimony most favorable to Plaintiff alone, the testimony does not establish much more than a somatic response to external stress. Such a response might indicate suffering, but does not indicate any consciousness.

As is well known, damages may not be awarded when the proof is speculative, and may not be grounded upon surmise or conjecture. *Wood v. Bell*, 2006 ME 98, ¶21, 902 A.2d 843, 851; *Carter v. Williams*, 2002 ME 50, ¶9, 792 A.2d 1093, 1098; *Michaud v. Steckino*, 390 A.2d 524, 530 (Me. 1978). Given Dr. Currier's testimony as a whole, it is difficult to classify it as anything but speculative on the issue of whether Ms. Crockett experienced any conscious pain or suffering prior to her death. For that reason, Defendants are entitled to summary judgment in their favor on Count II of the Complaint.

Negligent Infliction of Emotional Distress

In Count III of the Complaint, Dwain Coughlin individually seeks damages for the negligent infliction of emotional distress (NIED), a bystander claim arising out of Defendants' alleged negligent treatment of Ms. Crockett. Defendants argue they are entitled to summary judgment on this claim because Mr. Crockett is not sufficiently closely related to Ms. Crockett to be able to assert the claim, because he did not directly see or perceive the event, and because any distress was not sufficiently severe to support the claim.

A bystander to a negligent act or event that inflicts injury on another may recover if "he i) was present at the scene of the accident, ii) suffered serious mental distress as a result of contemporaneously perceiving the accident, and iii) was closely related to the victim." *Cameron v. Pepin*, 610 A.2d 279, 284-85 (Me. 1992), quoted and reaffirmed in *Coward v. Gagne & Son Concrete Blocks, Inc.*, 2020 ME 112 ¶ 31. As Ms. Crockett's live-in intimate partner and the father of their child, the court is satisfied that Mr. Coughlin could be considered "closely related to the victim". *See, e.g.*, 19-A M.R.S. § 4002(4) (individuals living together as spouses and parents of the same child are family or household members for purposes of domestic violence statutes).

The bigger obstacle is the requirement that Mr. Coughlin be present at the scene of the accident and contemporaneously perceive it. When he left Ms. Crockett's room, her labor was proceeding normally. He left the hospital for about one-half hour, returning only after the alleged negligent intubation. When he returned, he remained outside Ms. Crockett's room during all of the medical events and treatment, including the birth of Jayden. While the court has no doubt that he was upset, frightened and distressed as he waited at the hospital, he was not present nor did he contemporaneously perceive the negligent treatment, event or act.

While Mr. Coughlin did not have to directly witness the alleged negligent events in order to recover for NIED, he has to have been present and contemporaneously perceived it. As the Law Court has explained, "we have consistently applied both a spatial limitation (presence at the scene) and a temporal limitation (contemporaneous perception) to the scope of a defendant's duty in order to avoid the risk of imposing unlimited liability." *Coward v. Gagne & Son Concrete Blocks, Inc.*, 2020 ME 112 ¶ 15. Further, ""[t]he impact of such an experience"—that is, of a bystander witnessing the victim receiving an injury while the bystander is at the accident scene— "is qualitatively and quantitatively different from the distress occasioned by a subsequent visit to the hospital"." *Id.* at ¶ 19.

Thus, when parents arrive at the hospital and see their bloody and injured son shortly after an accident, they cannot assert a bystander NIED claim. *Cameron*, 610 A.2d 279. When a baby was removed from the nursery and negligently given to another maternity patient to breast feed, and the birth mother did not learn of it until approximately an hour later, the birth mother did not establish a claim for NIED. *Champagne v. Mid-Maine Med. Ctr.*, 1998 ME 87, ¶ 14. On the other hand, where the mother was present in the room while they treated and resuscitated her baby, she stated a claim for negligent infliction of emotional distress arising out of a birth injury. *Purty v. Kennebec Valley Medical Center*, 551 A.2d 858, 860 (Me. 1988). Similarly, a mother who saw her baby choking on a foreign object in baby food manufactured by the defendant also stated an NIED claim. *Culbert v. Sampson's Supermarkets, Inc.*, 444 A.2d 433 (Me. 1982).

Although the Law Court has expanded the claim beyond requiring direct observation of the accident, there must nonetheless be contemporaneous perception of the accident:

> [W]when a bystander does not directly *see* an injury-producing event in the moment the injury is first inflicted on the victim, the bystander, if present at the scene, may nonetheless "contemporaneously perceive[e] the accident," *Cameron*, 610 A.2d at 284-85, through a sensory perception of the injury-producing event as

8

it occurs and an observation of the victim's injuries or death in the immediate aftermath of that event. To establish that the bystander's observation of the victim's injuries occurred in the immediate aftermath of the injury-producing event, a bystander must demonstrate that the bystander perceived the injuries or death of the victim as an immediate result of the bystander's initial nonvisual perception of the injury-producing event.

*Coward*, 2020 ME 112 ¶ 28. Of particular significance here, the Law Court explained:

To further clarify, the "immediate aftermath" of the injury-producing event does not include a bystander's perception of the victim's pain and suffering away from where the accident occurred, nor does it include those situations where the bystander *does not perceive, in any manner, the occurrence of the injury-producing event and learns of the event only through other, indirect means.*

*Id.* at n. 17 (emphasis added). In looking at the undisputed facts in this case in the light most favorable to the Plaintiff, Mr. Coughlin was not in the room for any of the alleged negligent events; he was not even at the hospital for the most significant events alleged. When he arrived back at the hospital, he knew something was wrong but did not know what was happening to Ms. Crockett, what Dr. Peterkin did or what the treatment was. He only learned afterward what had happened. In this regard, he is situated no differently than any other family member waiting at a hospital for a surgery to be completed or a baby to be born, or seeing their child bloody and battered from an accident. While Mr. Coughlin was no doubt distressed, he did not contemporaneously perceive the alleged negligent act and resultant injury. Defendants are therefore entitled to summary judgment in their favor on Count III of the Complaint.

## Pecuniary Injuries

The wrongful death statute in effect at the time of Ms. Crockett's death provided in relevant part as follows:

. . . .The jury may give damages as it determines a fair and just compensation with reference to the pecuniary injuries resulting from the death and in addition shall give such damages that will compensate the estate of the deceased person for reasonable expenses of medical, surgical and hospital care and treatment and for reasonable funeral expenses. In addition, the jury may give damages not

9

exceeding $500,000 for the loss of comfort, society and companionship of the deceased, including any damages for emotional distress arising from the same facts as those constituting the underlying claim, to the persons for whose benefit the action is brought. . . .

18-A M.R.S. § 2-804(b). In Count I of the Complaint, Plaintiff seeks pecuniary damages including loss of Ms. Crockett's services, instruction, advice, counsel, parental training, care, guidance, assistance, protection, and attention to the physical, moral and educational welfare of her minor children. These damages are alleged to be separate from and in addition to the loss of comfort, society, companionship and emotional distress. The significance, of course, is that there is no cap on the amount which may be recovered if the damages are classified as pecuniary injuries as opposed to loss of comfort, society and companionship.

While the Law Court has not ruled on this question in so many words, there is some guidance. In 1938, the Law Court stated that

[The wrongful death statute] does not restrict recovery to the immediate loss of money or property. The words of the statute, allowing damages for "pecuniary injuries," look to the prospective advantages of a money nature, which have, in consequence of the premature death, been cut off. . . .

Sentimental hurts, losses from the deprivation of society or companionship, wounds of the affections, any distress of mind, any grief, suffered by the beneficial plaintiffs, are not elements which may properly find reflection in damages. . . .

A pecuniary loss or damage is a material one, susceptible of valuation in dollars and cents.

*Carrier v. Bornstein*, 136 Me. 1, 2-3, 1 A.2d 219, 220 (1938). Thus, a "pecuniary injury" refers to lost economic benefit which the decedent might have reasonably provided to the beneficiaries. The damages Plaintiff seeks as pecuniary injuries are really in the nature of loss of parental services, and the Law Court has held that "loss of services" is equivalent to loss of consortium. *Hall v. Patriot Mut. Ins. Co.*, 2007 ME 104, ¶ 22, 942 A.2d 663, 669. *See Pelletier v. Fort Kent*

10

*Golf Club*, 662 A.2d 220, 224 (Me. 1995) (recovery for loss of consortium when there is "an actual loss of services or affection"). Similarly, "loss of society" includes "the loss of positive benefits", and not just mental anguish, grief, or other emotional response to a death. *Sea-Land Services, Inc. v. Gaudet*, 414 U.S. 573, 585 n.17, 94 S. Ct. 806, 39 L. Ed. 2d 9 (1974).

Plaintiff argues that because the losses sought in Count I are capable of being monetized, they are indeed pecuniary losses. In support, Plaintiff primarily relies upon *Feighery v. York Hosp.*, 38 F. Supp. 2d 142, 148 (D. Me. 1999) in which the federal court held that damages for the loss of parental advice, counsel, and guidance are pecuniary and not subject to the cap contained in the Maine wrongful death statute. In doing so, the court stated

> It is useful to begin with the definition of pecuniary damages. Pecuniary damages are "such as can be estimated in and compensated by money; not merely the loss of money or salable property or rights, but all such loss, deprivation, or injury as can be made the subject of calculation and of recompense in money." *Black's Law Dictionary* 392 (6th ed. 1990). The Supreme Court shed further light on the meaning of pecuniary damages when it explained that pecuniary loss or damages in a wrongful death action should be equivalent to those pecuniary benefits or compensation that reasonably could have been expected to have resulted from the continued life of the deceased.

*Feighery*, 38 F. Supp. 2d at 148. As a result, the court concluded

> that the statutory cap on damages for the loss of comfort, society, and companionship does not act to limit recovery for all of the relational, as opposed to purely economic, losses that a child may suffer from the loss of a parent. Certain relational losses suffered by a child who loses a parent are, in fact, pecuniary because they are capable of being assigned a monetary value by a jury.

*Id.* With all due respect, this court disagrees.

It cannot be sufficient to suggest that claimed damages are pecuniary injuries simply "because they are capable of being assigned a monetary value by a jury." We ask jurors every day to assign a monetary value to pain, to suffering, to loss of enjoyment, to emotional distress, and indeed to the "loss of comfort, society and companionship of the deceased." Just because

"[c]ertain relational losses suffered by a child who loses a parent . . .are capable of being assigned a monetary value by a jury", *Feighery*, 38 F. Supp. 2d at 148, does not mean they are pecuniary losses. The clearer line is to separate out the relational losses from the economic losses, which also appears more consistent with the lines drawn in the statute.

For these reasons, the court agrees with Defendant that the damages claimed in Count 1 for the loss of Ms. Crockett's services, instruction, advice, counsel, parental training, care, guidance, assistance, protection, and attention to the physical, moral and educational welfare of her minor children are non-pecuniary losses, subject to the statutory cap. Partial summary judgment is granted in Defendant's favor on that basis.

### Loss of Future Income

Defendants have moved for summary judgment on the claim for loss of future income of Ms. Crockett, arguing that the evidence is too speculative to support an award. As previously noted, damages may not be awarded when the proof is speculative, and may not be grounded upon surmise or conjecture. *Wood*, 2006 ME 98, ¶21, 902 A.2d at 851; *Michaud v. Steckino*, 390 A. 2d at 530.

In this case, Ms. Crockett was young and had only a brief work history. Nonetheless, she apparently had been employed as a direct support professional, housecleaner, and other positions. While there is conflicting evidence in the record as to when or if she would have returned to employment after Jayden's birth, and what kind of employment she would have sought, nonetheless there is evidence supporting her loss of future earnings. Whether Plaintiff's expert's opinions on this issue are credible in whole or in part is for the jury. For these reasons, the motion for summary judgment as to the loss of future income is denied.

12

## Conclusion

For the foregoing reasons, summary judgment is granted to Defendants on Counts II and III of the Complaint. Partial summary judgment for Defendants is also entered on Count I to the extent that damages for "loss of Ms. Crockett's services, instruction, advice, counsel, parental training, care, guidance, assistance, protection, and attention to the physical, moral and educational welfare of her minor children" are subject to the cap for non-pecuniary losses in the wrongful death statute. Finally, summary judgment on the issue of the claim for loss of future income is denied. The entry will be: Defendants' motion for summary judgment is granted in part and denied in part; this order may be incorporated on the docket of the case by reference pursuant to Me. R. Civ. P. 79(a).

Dated: 5/10/2021

Valerie Stanfill
Justice, Maine Superior Court